UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

REPORT AND
RECOMMENDATION

- against -

CR 07-795 (NGG)(MDG)

MARQUISE CHISHOLM, also known as
"Marguise Chisholm,"

Defendant.

- - - - - - - - - - - - - - - - - -X

GO, United States Magistrate Judge:

Defendant Marquise Chisholm was indicted on three counts
for:  1) being a felon in possession of a weapon in violation of
18 U.S.C. § 922(g)(1); 2) possession of a defaced firearm in
violation of 18 U.S.C. § 922(k); and 3) possession with intent to
distribute heroin and marijuana in violation of 21 U.S.C.
§ 841(a)(1).  The Honorable Nicholas G. Garaufis has referred to
me for report and recommendation Chisholm's motion to suppress
the statements he made to police officers and physical evidence
seized from his home on August 15, 2007.

## BACKGROUND

On August 20, 2007, the government filed a complaint in
which Detective Raymond Martinez of the Gun Enhancement Unit of
the New York Police Department ("NYPD") sought a warrant for the
arrest of defendant Marquise Chisholm.  <u>See</u> Complaint (ct. doc.

1).  In his affidavit, Detective Martinez averred that the
defendant was arrested on August 15, 2007 after officers saw him
with a marijuana cigarette.  Id. at ¶ 2.  After he was arrested
and taken to the 73rd Precinct, the defendant told officers about
a gun he kept at his grandmother's house.  Id. at ¶¶ 2, 4.  The
officers proceeded to 537 Bradford Street, Apartment 1R, where
they conducted a search and recovered a gun, ammunition,
marijuana and heroin.  Id. at ¶¶ 5, 6.  The defendant was later
given Miranda warnings and made statements about having a gun in
his bedroom.  Id. at ¶ 7.

Defendant has moved to suppress the statements he made at
the precinct and the physical evidence seized from his person
following his arrest and from his grandmother's house as a result
of warrantless searches.  See Defendant's Motion to Suppress (ct.
doc. 12).  Besides contending that all his statements and the
evidence seized were the fruits of an unlawful search and arrest,
he also claims that no valid consent had been given to search and
seize the evidence found at his grandmother's residence, in
violation of his rights under the Fourth Amendment to the United
States Constitution, and that his initial statements at the
station house were obtained in violation of his rights under the
Fifth Amendment.

## FINDINGS OF FACT

This Court makes the following findings of fact based on the
evidence adduced at a suppression hearing held on January 3 and

17, 2008[1] and the affidavit of defendant sworn on December 4, 2007 ("Chisholm Aff.") attached to the notice of motion filed herein.  See ct. doc. 12.  Since the government and defendant offer very different versions of the events surrounding the arrest and questioning of the defendant and the search of his grandmother's apartment, the conflicting accounts will also be briefly discussed below.  The government presented its case primarily though the testimonies of New York Police Department ("NYPD") Lieutenant John Rafferty of the 73rd Precinct, who, together with Officer Edson Gloragille and other officers, were part of a unit focused on dealing with a narcotics problem within the Howard Houses complex in Brooklyn.  1/3/08 Tr. at 6.  The defendant called Officer Gloragille, defendant's friend, Taiquana Hazel, his grandmother, Miriam Staley, and his mother, Barbara Chisholm.

The Arrest

What is undisputed is that on August 15, 2007 at approximately 11:30 a.m., the defendant was standing near a bench along the walkway in front of 80 Osborn Street in Brooklyn when an unmarked police vehicle pulled up.  1/3/08 Tr. 7-8, 35-36, 97-99.  Some people were sitting on the bench.  Id. at 10 (Lt. Rafferty observed several other people in the area); see id. at 118, 130 (Ms. Hazel testified she and two other people were on

---

[1] References to pages in the transcript of the hearing held on January 3, 2008 shall be preceded by "1/3/08 Tr." and references to the transcript of the hearing held on January 17, 2008 shall be preceded by "1/17/08 Tr."

the bench). The officers in the vehicle got out and questioned the defendant before arresting him for possession of marijuana. Id. at 8, 98-99; 1/17/08 Tr. at 12-13. The major areas of factual contention are the number of officers involved, whether Chisholm was smoking and disposed of a marijuana cigarette when the officers arrived and whether the officers retrieved any bags of marijuana from the defendant's person during a pat-down.

In his affidavit, defendant states that when the police approached him in front of 80 Osborn Street, he was not smoking a marijuana cigarette and did not throw a marijuana cigarette on the ground and step on it. Chisholm Aff. at ¶ 1. Nonetheless, police officers approached him, ordered him to freeze, searched him and arrested him. Id. The defendant did not testify at the suppression hearing. Absent his live testimony and the opportunity for cross-examination, the Court cannot assess his credibility or truthfulness. As a result, I credit the testimony of the live witnesses over the contents of defendant's affidavit where a conflict exists. See United States v. Miller, 382 F. Supp. 2d 350, 362-63 (N.D.N.Y. 2005); United States v. Al-Marri, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002); United States v. Juliano, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at *3 n.3 (S.D.N.Y. Aug. 24, 2000); United States v. Frank, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998).

Both Lt. Rafferty and Officer Gloragille testified they were alone in an unmarked car driving along the public walkways of the Howard Houses when they observed the defendant smoking what

appeared to be a marijuana cigarette. 1/3/08 Tr. at 6-7; 1/17/08 Tr. at 6-9, 67-68. After the officers stopped and got out of the car to approach the defendant, the officers saw him crush the marijuana cigarette in his hand and toss it into the grass behind him. 1/3/08 Tr. at 8, 41; 1/17/08 Tr. at 9, 15. Lt. Rafferty testified that he went in front of the defendant, while Officer Gloragille went behind and to the side of the defendant, and asked the defendant if there was anything in his pockets that would hurt the officers. 1/3/08 Tr. at 8-9. Officer Gloragille testified that both he and Lt. Rafferty stood in front of the defendant while Officer Gloragille asked the defendant whether he had been smoking marijuana and the defendant answered that he was. 1/17/08 Tr. at 12, 105-06. Defendant responded that he had two or three bags of marijuana in his pocket. 1/3/08 Tr. at 9; 1/17/08 Tr. at 12, 69. One of the officers patted down the defendant and searched him but did not seize the marijuana.[2] 1/3/08 Tr. at 9, 41; 1/17/08 Tr. at 106. Officer Gloragille then handcuffed the defendant and placed him in the police car. 1/3/08 Tr. at 9; 1/17/08 Tr. at 13. Both officers searched the grass for the marijuana cigarette but were unable to find it. 1/3/08 Tr. at 9; 1/17/08 Tr. at 10.

---

[2] On cross-examination, Lt. Rafferty stated that Officer Gloragille "patted down [the defendant] for weapons and whatnot. I believe Officer Gloragille was trying to obtain the marijuana off of the person. I don't know if he couldn't get it out, but he was patted down, searched at the scene." 1/3/08 Tr. at 41. On the other hand, Officer Gloragille testified that he did not frisk the defendant and he could not remember whether Lt. Rafferty frisked him. 1/17/08 Tr. at 106.

In contrast, Taiquana Hazel testified that when officers in an unmarked police car pulled up, she was sitting on a bench with two other people talking to the defendant who was standing to the side of the bench facing them. 1/3/08 Tr. at 97-98, 130-31. Neither the defendant nor any of the other people present were smoking marijuana or any other substance at the time. Id. at 99, 130-31. Four police officers got out of the car, two dressed in uniform and two in plain clothes. Id. at 99. She identified the driver of the car, who was in plain clothes, as Lt. Rafferty. Id. at 99, 121, 127, 136-37. Lt. Rafferty stood between the defendant and her, while the other three officers stood in front of the bench. Id. at 132. Lt. Rafferty asked the defendant whether he had anything on him that he should not have, and defendant answered that he did not. Id. at 99. Lt. Rafferty then asked defendant if he could search him and the defendant said okay. Id. at 99. As defendant said yes, Ms. Hazel saw the defendant raise his hands. Id. at 132-33. Lt. Rafferty searched defendant's person and found a bag of marijuana in defendant's pocket. Id. at 99, 123. After Lt. Rafferty found the bag of marijuana, the officer she later identified as Officer Gloragille asked the defendant if he had anything else on him. Id. at 125, 129. Lt. Rafferty then placed the defendant in handcuffs. Id. at 121.

I found Ms. Hazel credible and truthful in her testimony, despite her admitted friendship with the defendant, whom she had personally known for three years, and her lifelong friendship

with his girlfriend. 1/3/08 Tr. at 97, 114, 120. Thus, I credit her version of the events where it conflicts with that offered by Lt. Rafferty and Officer Gloragille and find that the defendant was not smoking marijuana when approached by four police officers[3] and was questioned and searched by Lt. Rafferty before being handcuffed.

Lt. Rafferty and Officer Gloragille also appeared truthful, but their hearing testimonies conflicted with the facts set forth in the complaint, Officer Gloragille's testimony before a federal grand jury on October 26, 2007 and the government's description of the facts in its December 28, 2007 response to the defendant's

---

[3] Ms. Hazel testified that she saw all four of the officers in the courthouse before she testified. 1/3/08 Tr. at 121-27. Besides Lt. Rafferty, she identified Officer Gloragille, Officer Thomas Hardell and Officer Kaz Daughtry, who were present at the hearing, as the other officers present at defendant's arrest. Id. at 134-36. Lt. Rafferty testified that he and Officer Gloragille left the precinct with Officers Daughtry and Mitchell in the car, but dropped off these two officers before starting patrol at the Howard Houses because the NYPD does not permit four officers to patrol together. Id. at 35-37. Lt. Rafferty's memo book contains a notation for August 15, 2007 indicating that he was assigned to vehicle #134 with Officers Daughtry, Gloragille and Mitchell and that they left on patrol at 10:30 a.m. Def.'s Exh. 4; 1/3/08 Tr. at 35. Lt. Rafferty's memo book also contained an entry for 1:45 p.m. indicating that he was on patrol with Officers Gloragille and Hardell. See Def.'s Exh. 4.

Officer Gloragille testified that he had a "vivid recollection" that he left the precinct only with Lt. Rafferty. 1/17/08 Tr. 6-9. However, Officer Daughtry, whose memo book indicated that he went out on patrol at 10:00 a.m. with Lt. Rafferty, denied leaving the precinct with Officers Hardell and Gloragille and being present for the defendant's arrest. Id. at 167-169. Officer Daughtry also admitted that all of them were part of a team and would either be on patrol or in the precinct. Id. at 174. Sometimes several officers would leave together for patrol but separate as arrests were made. Id. at 176-77, Officer Hardell testified that he was certain he was not present at the defendant's arrest and happened to be in the courtroom to drive Lt. Rafferty back to the precinct that day and had nothing to do with the arrest. Id. at 157-58, 164-65. Although Ms. Hazel may have misidentified Officer Hardell, I find her testimony credible, as opposed to the hazy and conflicting recollections of the officers relying on incomplete notations in their memo books.

motion to suppress (ct. doc. 13). In the complaint, Detective
Martinez stated that when an officer approached the defendant,
the defendant "dropped the marihuana cigarette to the ground and
stepped on the cigarette with defendant's foot." Ct. doc. 1 at
¶ 2. Two months later, Officer Gloragille testified before a
federal grand jury that he recovered a marijuana cigarette after
the defendant squeezed the cigarette in his hand and dropped it
on the ground as the officers approached. 1/17/08 Tr. at 16. At
the suppression hearing the officers did not testify that the
defendant stepped on a marijuana cigarette or that they recovered
the marijuana cigarette.

Officer Gloragille attempted to explain that he was unable
to remember that he did not recover the marijuana cigarette until
he reviewed a property voucher that was unavailable to him when
he testified before the grand jury. Id. at 71. However, this
does not explain the different accounts of how defendant dealt
with the marijuana cigarette when the officers approached.
Furthermore, in a "Supporting Deposition" submitted in support of
the criminal complaint filed in Brooklyn Criminal Court that he
signed on the date of the arrest on August 15, 2007, Officer
Gloragille did not mention a marijuana cigarette and indicated
that defendant had in his hand 3 ziplock bags of marijuana that
were visible and open to public view. 1/17/08 Tr. at 16-18;
Def.'s Exh. 5. Officer Gloragille similarly indicated on a form,
called a Misdemeanor Narcotics Possession Fact Sheet, the
recovery of three ziplock bags of marijuana from defendant's hand

that were in public view, but nothing else.  Def.'s Exh. 6.  That there was no cigarette recovered should have been apparent from these documents.

I also find the officers' claim that they made a vain search for the cigarette in the grass after cuffing the defendant strained, particularly since they both also testified that there were remnants of the marijuana cigarette in the defendant's hand. 1/3/08 Tr. at 9, 42; 1/17/08 Tr. at 11, 26.  In addition, Officer Gloragille testified, contrary to his statements in the earlier reports, that there were no ziplock bags in defendant's hands. 1/17/08 Tr. at 20.  While some of these inconsistencies arguably can be attributable to Officer Gloragille's haste in filling out the paperwork, the discrepancies underscore the fact that the officers, who both had made numerous arrests since arresting the defendant, had, at best, imperfect memories of that particular arrest.  1/3/08 Tr. at 81; 1/17/08 Tr. at 46, 161.

In contrast, I found Ms. Hazel's testimony consistent and credible.  Despite the government's attempt to point to purported discrepancies in Ms. Hazel's testimony, the arguments were based on out of context interpretations of her statements.  <u>See</u> Government's Post-Hearing Brief in Opposition to Defendant's Pretrial Motion to Suppress ("Govt.'s Post Hr'g Br.") (ct. doc. 16) at 9-10.  Contrary to the government's claim, Ms. Hazel did not testify that the defendant was seated on the bench, but, instead, consistently testified that the defendant was standing when the police arrived.  1/3/08 Tr. at 97-98, 110, 127-28, 130.

The government also failed in its attempt to point to an
inconsistency in Ms. Hazel's testimony that a person named
"Roxie" was "the only person present on the scene" when the
defendant was arrested, Govt.'s Post Hr'g Br. at 9-10, since Ms.
Hazel did not so testify and the government did not, in fact, ask
her about the persons present at the time of the arrest.  1/3/08
Tr. at 112.  Likewise, even though Ms. Hazel testified she was on
her way to the store when the police arrived, the undisputed
testimony that Ms. Hazel was talking to the defendant and others
undermines the government's attempt to show Ms. Hazel was not
consistent in this aspect of her testimony.  Govt.'s Post Hr'g
Br. at 10.

     Finally, I am also not persuaded by the government's
contention that Ms. Hazel is an unreliable witness due to her
past drug use since it has no bearing on her observations during
defendant's arrest, in the absence of any evidence that her
perceptions were somehow affected at that time.  See United
States v. Whitley, No., 04 CR 1381 (RCC), 2005 WL 2105535, at *3
(S.D.N.Y. Aug. 31, 2005); Minques v. Bezio, No. 96 CIV. 5396
(JSR) (HBP), 1999 WL 637228, at *1 (S.D.N.Y. Aug. 19, 1999).  In
fact, neither officer testified that they observed any person
smoking marijuana other than Chisholm.

Initial Questioning of the Defendant

     The defendant states in his affidavit that when officers
attempted to question him at the precinct after his arrest, he
refused to answer and waive his rights, but felt compelled to

answer as the officers continued to ask him questions. Chisholm
Aff. at ¶ 2. As noted above, in the absence of defendant's live
testimony, I give his affidavit little weight and credit Lt.
Rafferty's testimony regarding the questioning of the defendant
at the precinct.

Lt. Rafferty credibly testified that after defendant's
arrest, he and Officer Gloragille drove the defendant to the 73rd
Precinct where Officer Gloragille recorded defendant's pedigree
information at the front desk. 1/03/08 Tr. at 10-11. The
defendant was later brought to the cell area and subject to a
search. Id. at 11.[4] Lt. Rafferty and Officer Gloragille then
returned to patrolling the Howard Houses complex. Id. at 13. At
approximately 1:00 p.m., a black male approached the officers in
front of 1548 East New York Avenue. Id. The unidentified male
told the officers that the man they had arrested in front of 80
Osborn Street had been involved in a shooting two weeks earlier.
Id.

At approximately 2:15 p.m., the officers returned to the
73rd Precinct and went to the cell area to speak with the
defendant. Id. at 14. Prior to commencing the interview, Lt.
Rafferty advised defendant of his Miranda rights and presented
defendant with a waiver form. Id. at 14-16. Although defendant

---

[4] Lt. Rafferty also testified that three plastic bags of
marijuana were found following the search at the precinct. 1/3/08 Tr.
at 11. However, I find, based on Ms. Hazel's testimony, that a bag of
marijuana was found at the time of defendant's arrest, but my finding
does not preclude that additional bags may have later been recovered
by the officers at the precinct.

answered affirmatively to each question on the form, including his understanding of his rights and his willingness to speak with the officers, defendant refused to sign the waiver form. Id. at 16, 91. Lt. Rafferty then wrote "refused" on the form's signature line. Id. at 16. However, the defendant indicated a willingness to talk and did not ask for an attorney. Id. Lt. Rafferty proceeded to engage in a "fishing" expedition to verify the accuracy of the information given by the informant earlier and threw out questions regarding a recent shooting and whether defendant possessed a gun. Id. at 16-17. Although denying that he was involved in any shooting, defendant stated that he kept a gun at the apartment he shared with his grandmother at 537 Bradford Street. Id. at 17-18.

Lt. Rafferty then presented the defendant with a consent to search form, but the defendant also refused to sign this form. 1/03/08 Tr. at 62. The defendant said the gun was at his grandmother's house and told Lt. Rafferty that, "You can do whatever you want with that." Id. at 18, 20, 62-63. On the basis of that statement, Lt. Rafferty believed that defendant had granted his consent to search the apartment. Id. at 20.

During the interview, the defendant was in his cell and was not handcuffed. Id. at 90. Lt. Rafferty spoke to him in a conversational tone and the defendant was initially talkative, but later seemed to be upset. Id. The interview lasted for approximately 35-40 minutes. Id. at 58.

The defendant also does not contest that he was questioned by Lt. Rafferty and refused to sign a waiver. Def.'s Aff. at ¶ 4. Rather he attempts to challenge the timeline offered by Lt. Rafferty by arguing that the officer could not have returned to the precinct to question the defendant by 2:15 p.m. as he claimed, in light of the times of other arrests at 1:30 p.m. and 2:15 p.m. reflected in the officer's memo book. Defendant's Post Hearing Memorandum in Support of Motion to Suppress ("Def.'s Post Hr'g Mem.") (ct. doc. 17) at 9-10 (comparing 1/3/08 Tr. at 46-50 with Def.'s Exh. 4); see also 1/3/08 Tr. at 33. However, I found the explanation offered by Lt. Rafferty, that he may not have actually been present at arrests reported to him, to be credible.

The Search of 537 Bradford Street

After he finished questioning Chisholm about 3:00 p.m., Lt. Rafferty then proceeded with Officer Gloragille, Sergeant Martin and Officer Mitchell to drive to the apartment of Miriam Staley, the defendant's 84 year old grandmother, to recover the gun. 1/3/08 Tr. at 19, 84. Many of the facts regarding the search of Apartment 1R at 537 Bradford Street are undisputed, except for the time and circumstances surrounding the signing of a consent to search form that both Miriam Staley and Barbara Chisholm, the defendant's mother, signed.

Lt. Rafferty testified that Ms. Staley's apartment is located in a three story apartment building. Id. at 21. When the officers arrived, they rang the front doorbell and were met at the front door by Ms. Staley and Ms. Chisholm who were on

their way out. 1/3/08 Tr. at 22; 1/17/08 Tr. at 117. Lt. Rafferty told Ms. Staley and Ms. Chisholm that the defendant had been arrested and that the defendant had something in the apartment that he wanted the police to recover. 1/3/08 Tr. at 22. The women invited the officers to enter the apartment and spoke to them in the kitchen. Id. at 23-24. Explaining to the women that the officers came to recover a gun that the defendant had told the officers they could retrieve, Lt. Rafferty asked the women to sign a consent to search form, which he presented within five minutes of his arrival. Id. at 67. Upon hearing the women say that the defendant lived in the rear bedroom and sometimes slept on a couch in the living room, Lt. Rafferty wrote on the form that the consent was limited to the "rear bedroom" and "living area." Id. at 27. Ms. Chisholm readily signed, but Ms. Staley, who was upset that her grandson had been arrested and started shaking, did not sign the consent until after taking some medication. Id. at 24, 26, 67. The officers waited to begin their search until Ms. Staley signed the form. Id. at 67.

Lt. Rafferty also testified that Ms. Chisholm directed him, Officer Gloragille and Officer Mitchell to the defendant's bedroom while Ms. Staley remained in the kitchen. Id. at 27, 29, 65. The two officers conducted the search, while Lt. Rafferty observed. Id. at 27, 30; 1/17/08 Tr. at 83-90. During the search, Ms. Chisholm attempted to help the officers by "pulling stuff out of the room," "going through the dresser," and

"point[ing] to the closet," until Lt. Rafferty asked her to allow the officers to conduct the search. Id. at 28.

Officer Gloragille testified that the bedroom was neatly kept. Id. at 82. The bedroom furniture consisted of a bed in the middle of the room and a dresser on either side of the bed. Id. While the officers searched, Ms. Chisholm asked them not to mess up the room. 1/17/08 Tr. at 82. First searching the dresser located to the right of the bed, Officer Gloragille observed neatly folded sheets and clothes. Id. at 83-84. Officer Gloragille then joined Officer Mitchell in a search of a dresser to the left of the bed and found heroin, marijuana and a spoon which he believed to be drug paraphernalia. Id. at 85-86.

Officers Gloragille and Mitchell also searched the bedroom closet. Id. at 88-89. Officer Gloragille testified that he recalled the closet door was slightly ajar. Id. at 88. Officer Gloragille found ammunition in the pocket of a jacket that was hanging in the closet and a gun and ammunition on the closet shelf. Id. at 89-90. The search took about 30 minutes and the officers left the apartment at approximately 5:00 p.m. 1/3/08 Tr. at 31.

Defendant's grandmother, Miriam Staley, submitted both an affidavit in support of defendant's motion and testified about the search conducted in her two bedroom apartment that she rents. Ct. doc. 12 at 23; 1/17/08 Tr. at 109-10, 121. The defendant has resided in the apartment since the death of Ms. Staley's husband in 1999 and has his own bedroom, which contains a bed, dresser,

night table, and television stand owned by Ms. Staley.  Id. at
110, 121-22.  The bedroom has a closet which does not contain a
shelf, but there is a box perched on the closet rod.  Id. at 113,
134; Govt.'s Exh. F; Def.'s Exh. 12.  Ms. Staley testified that
she does not keep any of her belongings in either the defendant's
bedroom closet or his dresser.  1/17/08 Tr. at 110-11.  She
hardly ever enters defendant's bedroom, but on occasion, Ms.
Staley puts the defendant's mail and laundry she has cleaned on
his bed.  Id. at 122-26.  The defendant has never asked Ms.
Staley not to open his dresser or closet.  Id. at 126.

On August 15, 2007, the police rang Ms. Staley's doorbell.
While speaking to the policemen in the hallway outside her
apartment, the police told her that the defendant was involved in
a shooting.  Id. at 114.  She testified that she invited the four
police officers into her apartment to avoid drawing her
neighbors' attention.  Id.  Ms. Staley stated that one officer
was white and he was the one who asked Ms. Staley if the
defendant lived there and where his bedroom was located.  Id. at
115.  After she said that the defendant lived at the apartment
and pointed to his bedroom, three of the officers walked towards
the bedroom and began searching the room.  Id. at 116.  Ms.
Chisholm followed the officers to the bedroom, but ran back and
forth between the bedroom and kitchen to look after her, because
Ms. Staley was feeling terrible.  Id.  Lt. Rafferty later
returned to the kitchen and asked her to sign a consent form that

her daughter had already signed giving the police permission to take the seized items from her home. Id. at 117.

Barbara Chisholm similarly testified that after four officers entered her mother's apartment and Ms. Staley pointed out the defendant's bedroom, three of the officers walked towards the bedroom while one of the officers stayed in the kitchen with Ms. Staley. Id. at 139-41. Ms. Chisholm followed the officers to the bedroom and asked them what they were doing, but they ignored her. Id. at 141, 149. Ms. Chisholm told the officers not to mess up the room. Id. at 149. During the search, Ms. Chisholm walked back and forth between the bedroom and the kitchen to check on her mother who was hysterical and screaming. Id. 141, 149-50. When the officers were finished searching, the white officer told Ms. Chisholm that they needed her to sign the consent form in order to remove the items they found from the apartment. Id. at 142-44. Ms. Chisholm testified that she signed the form without reading it because she was upset about her mother's condition and believed that the items had to be taken out of the apartment. Id. at 141. After Ms. Chisholm signed the form, the officers left the bedroom and went to the kitchen where Ms. Staley then signed the consent form. Id. at 144. Ms. Chisholm did not have any of her belongings in the bedroom and she does not enter her son's bedroom. Id. at 145.

In evaluating the testimonies of the witnesses, I found Lt. Rafferty and Officer Gloragille to be more credible than Ms. Staley and Ms. Chisholm. Both women were remarkably consistent

in their accounts, but were overly concerned about not saying anything that undermined the defendant's contention that consent to search was not properly obtained. Both were reluctant to say anything that suggested that anyone other than the defendant accessed the bedroom, despite Ms. Staley's statement in her affidavit in support of defendant's motion that she "hardly ever enter[ed] the room." Ct. doc. 12 at 23. She was not believable when she first explained that she did not go into the defendant's bedroom and then that she would quickly enter the defendant's bedroom and simply put on his bed his mail and laundry that she had washed. 1/17/08 Tr. at 122-26. Likewise, I did not find credible Ms. Chisholm's testimony that she does not enter the defendant's room and was last in the bedroom when her father was alive, even though she admitted she helped her mother straighten up the apartment. Id. at 147-48.

In contrast, I found that Lt. Rafferty credibly testified that Ms. Staley and Ms. Chisholm signed the consent to search form before the officers searched the defendant's bedroom. His testimony was essentially consistent with the testimony of Officer Gloragille.[5] Lt. Rafferty testified that he took out the consent form within 5 minutes of the officers' entry into the

---

[5] The one fact that Officer Gloragille did not corroborate was Lt. Rafferty's statement that Ms. Chisholm signed the form in the kitchen as alleged by Lt. Rafferty. Officer Gloragille testified that he did not recall seeing Ms. Chisholm sign the consent form there. Compare 1/3/08 Tr. at 26 with 1/17/08 Tr. at 80. However, Officer Gloragille also did not testify that Ms. Chisholm signed the consent in the bedroom, even though he clearly was in the bedroom during the entire search and, presumably, during the time that Ms. Chisholm claims she signed the consent there. 1/17/08 Tr. at 122-24.

apartment at 4:00 p.m.  1/3/08 Tr. at 66; Def.'s Exh. 4.  His
memo book notes and the consent form reflect that the form was
signed by Ms. Chisholm and Ms. Staley at approximately 4:30 p.m.

Crediting Lt. Rafferty's account, I find that he asked Ms.
Chisholm and Ms. Staley to sign the consent form and both signed
the consent form before the officer began the search.  However, I
do not find, as testified by Officer Gloragille, that a gun and
ammunition were recovered from the top shelf in the bedroom
closet, 1/17/08 Tr. at 89-91; see also Complaint at ¶ 6, As Ms.
Staley testified the closet does not contain a shelf.  1/17/08
Tr. at 113.  The photographs of the closet taken during the
search and by the defendant in November 2007 confirm that rather
than a shelf, there is a large box that appears to be made of
cardboard perched to the left side of the closet rod.  See
Govt.'s Exh. F and Def.'s Exh. 12; 1/3/08 Tr. at 29-30; 1/17/08
Tr. at 133-34.

I do not necessarily agree with Ms. Staley that it is not
possible to put something on top of the box, 1/17/08 Tr. at 134,
since she is not a tall woman and may not have been able to see
or reach the top of the box.  However, the closet rod appears to
be hung high in the closet and the top of the box appears to be
too high for someone to reach objects placed on top of it.
Officer Gloragille testified that while he was in the closet
patting down a jacket, Officer Mitchell, who was also in the
closet, looked at the top shelf and saw the gun.  Id. at 89.
However, the government's picture of the closet on the day of the

-19-

search shows that there were a few jackets hanging on the rod from around the center to the left side of the closet. <u>See</u> Govt.'s Exh. F; 1/3/08 Tr. at 29-30. The closet has a standard sized looking single door which opens into the bedroom from the right. Given the size of the closet, it is hard to understand how any other person could also stand in the closet at the same time as Officer Gloragille, who is quite broad, or stand near enough to the closet to be able to see the top of the box sitting on the closet rod. In the absence of clearer evidence, I cannot find that the gun was visible simply sitting on top of the box in the closet when recovered by the officers. It is more likely that it was inside the box in the closet, a far more logical place for the defendant to store a weapon in his grandmother's home, and that the gun was found inside the box in the course of the search.

<u>Further Questioning of the Defendant</u>

Lt. Rafferty and Officer Gloragille then returned to the 73rd Precinct to re-arrest the defendant based on the new evidence that was recovered. 1/3/08 Tr. at 31-32. Defendant was re-processed at approximately 5:30 p.m. <u>Id.</u> at 32. Lt. Rafferty told defendant that they had recovered the gun and defendant responded, "I told you, you could do what you want with that." <u>Id.</u> Regarding the narcotics that were recovered, defendant hung his head and said, "I'm just trying to make a couple of dollars." <u>Id.</u> Later that evening, Officer Gloragille was present while two detectives from the Gun Enhancement Unit interviewed the

defendant. 1/17/08 Tr. at 43. Prior to the interview, the defendant executed a <u>Miranda</u> waiver form. <u>Id.</u> at 43-44; Def.'s Exh. 9.

## **DISCUSSION**

On a motion to suppress, "once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." <u>United States v. Wyche</u>, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004).

<u>The Arrest</u>

Where a defendant challenges the legality of an "arrest without a warrant, the burden is on the Government to show that there was probable cause for the arrest." <u>United States v. Pena,</u> 961 F.2d 333, 338-39 (2d Cir. 1992). The determination whether probable cause exists must be based on the totality of the circumstances. <u>See</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983).

Having credited Ms. Hazel's version of the facts surrounding defendant's arrest, I rely on Ms. Hazel's testimony in analyzing the circumstances leading to defendant's arrest. Both defendant and the government focus their arguments on the hotly contested factual dispute whether Chisholm was smoking a marijuana cigarette when the officers approached. Defendant argues that since he was not smoking a marijuana cigarette, the police lacked probable cause to believe that he was committing a crime and thus unlawfully searched and arrested him. <u>See</u> Declaration of Florian

Miedel, Esq., counsel for defendant, in support of motion to suppress (ct. doc. 12) at ¶ 12.  However, the determination of the legality of the search and arrest of the defendant depends on whether his contact with the officers amounted to a "seizure" within the meaning of the Fourth Amendment.

Courts have recognized "three levels of interaction between agents of the government and private citizens" in assessing whether a defendant has been subject to an unreasonable search and seizure in violation of the Fourth Amendment.  United States v. Tehrani, 49 F.3d 54, 58 (2d Cir. 1995); United States v. Hooper, 935 F.2d 484, 490 (2d Cir. 1991).  First, consensual encounters occur when "an individual willingly agrees to speak with law enforcement personnel."  United States v. Glover, 957 F.2d 1004, 1008 (2d Cir. 1992).  Such an encounter does not require any objective level of suspicion so long as "a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter."  United States v. Thompson, 941 F.2d 66, 69 (2d Cir. 1991); see Florida v. Bostick, 501 U.S. 429, 434 (1991).  During consensual encounters, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ...; ask to examine the individual's identification ...; and request consent to search his or her luggage ... as long as the police do not convey a message that compliance with their requests is required."  Bostick, 501 U.S. at 434.  The second type of encounter is a limited investigative stop which is considered a

"seizure" and requires that an officer have "a reasonable
suspicion supported by articulable facts that criminal activity
'may be afoot.'" Terry v. Ohio, 392 U.S. 1, 30 (1968).  The
third type of encounter is an arrest which must be based on
probable cause.  See Glover, 957 F.2d at 1008.

A consensual encounter ripens into a Terry stop when "it
loses its consensual nature." Bostick, 501 U.S. at 434.  "Only
when the officer, by means of physical force or show of
authority, has in some way restrained the liberty of a citizen
may we conclude that a 'seizure' has occurred." Terry, 329 U.S.
at 19.  The test for determining that point at which a police
encounter with a suspect ripens into an investigative detention
or into a seizure requires "taking into account all of the
circumstances surrounding the encounter," and asking whether the
"police conduct would have communicated to a reasonable person
that he was not at liberty to ignore the police presence and go
about his business." Kaupp v. Texas, 538 U.S. 626, 629 (2003);
United States v. Mendenhall, 446 U.S. 544, 554 (1980) (person is
"seized" within meaning of Fourth Amendment when, in view of all
the circumstances, a "reasonable person would have believed that
he was not free to leave").  The Second Circuit has identified a
number of factors that might suggest a seizure:  the threatening
presence of several officers; the display of a weapon; the
physical touching of the person by the officer; language or tone
indicating that compliance with the officer was compulsory;
prolonged retention of a person's personal effects, such as plane

tickets or identification; and a request by the officer to accompany him to the police station or a police room.  Glover, 957 F.2d at 1008.

Applying the legal standards to the facts as related by Ms. Hazel, I find that no seizure triggering Fourth Amendment protections occurred during the initial questioning of the defendant by Lt. Rafferty and that the encounter was consensual up until the time he was placed under arrest.  As Ms. Hazel testified, Lt. Rafferty simply went up to the defendant and asked him two questions.  Although accompanied by three other officers, Lt. Rafferty alone approached the defendant, who was standing to the side of a public bench and facing Ms. Hazel and another person who were sitting on the bench.  This initial contact was consensual since "a seizure does not occur simply because a police officer approaches an individual and asks a few questions."  Bostick, 501 U.S. at 434.  As the Supreme Court emphasized,

> [E]ven when officers have no basis for suspecting a
> particular individual, they may generally ask questions
> of that individual, ... ask to examine the individual's
> identification ... and request consent to search his or
> her luggage ... as long as the police do not convey a
> message that compliance with their requests is
> required.

Id. at 434-35 (citations omitted).

There is no evidence that any of the officers acted in a threatening or intimidating manner, displayed a weapon, told the defendant to stand still, tried to control the defendant's movements or touched him before he consented to a search.

Further, there is no requirement that an officer advise the interviewee that he is free to leave or terminate the interview. See United States v. Peterson, 100 F.3d 7, 10 (2d Cir. 1996).

The only factor suggesting coercion is the presence of four police officers. However, in the very brief encounter, the officers did not "by means of physical force or show of authority, ... in some way restrain[] the liberty of" the defendant. Bostick, 501 U.S. at 434. While I recognize that "most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response." INS v. Delgado, 466 U.S. 210, 216 (1984). Thus, I find under the totality of the circumstances that there was no "seizure" under the Fourth Amendment during the questioning of the defendant. See Mendenhall, 446 U.S. at 554 (holding that approach and request for identification in airport concourse by two DEA agents was not a seizure); Peterson, 100 F.3d at 10-11 (finding that defendant was not seized when two officers approached and asked what was in his knapsack); Glover, 957 F.2d at 1008-09 (finding encounter consensual where defendant was questioned in bus stop); United States v. Grant, No. 07 CR 749 (SJ)(VVP), 2008 WL 897805, at *2-4 (E.D.N.Y. Mar. 31, 2008) (encounter consensual when defendant approached on the street by three officers); United States v. Robles, 253 F. Supp. 2d 544, 550-51 (S.D.N.Y. 2002) (encounter "voluntary" when three officers

got out of their car and approached defendant and another person on the street).

Moreover, given the undisputed testimony that the defendant immediately complied with Lt. Rafferty's request to search, I also conclude that the defendant voluntarily gave his consent to search.  See Peterson, 100 F.3d at 11.  Defendant clearly understood the request and indicated his assent by raising his hands.  See United States v. Crews, 30 F.3d 131 (Table), 1994 WL 396339, at *1 (4th Cir. 1994) (affirming finding of voluntary consent where defendant said nothing in response to request to search his person, but raised his hands to one side as if he were opening up his arms); United States v. Wilson, 895 F.2d 168, 172 (4th Cir. 1990) (per curium) (finding consent to a pat down where defendant shrugged his shoulders and raised his arms).  Again, the only factor supporting a finding of coercion is the presence of four officers, which, as discussed, is insufficient to invalidate the consent.  Of course, once bags of marijuana were found in defendant's pocket, there was probable cause to arrest the defendant.  See United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983).  Accordingly, insofar as defendant seeks to suppress both physical evidence and his statements as "fruit" of an unlawful search and arrest, I find that this component of his motion fails.

<u>Defendant's Statements</u>

The defendant further argues that the government has not met its burden of demonstrating that he voluntarily and knowingly waived his <u>Miranda</u> rights at the precinct.  The Fifth Amendment provides that:  "No person shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In order to safeguard the suspect's Fifth Amendment rights, law enforcement agents conducting a custodial interrogation must advise a suspect that he has the right to remain silent, that any statement he makes may be used as evidence against him, and that he has the right to have counsel present.  <u>See</u> <u>Stansbury v. California</u>, 511 U.S. 318, 321 (1994); <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>United States v. Ramirez</u>, 79 F.3d 298, 304 (2d Cir. 1996).  However, a defendant may waive his Fifth Amendment rights if the waiver is made voluntarily, knowingly and intelligently.  <u>See</u> <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>Miranda</u>, 384 U.S. at 444-45.  In proving the validity of the waiver, the government bears the burden of showing by a preponderance of the evidence that the defendant voluntarily relinquished his right and "had a full awareness of the right being waived and the consequences of waiving the right." <u>United States v. Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995); <u>see</u> <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).

The court must examine the totality of the circumstances in determining the validity of the waiver.  <u>See</u> <u>Moran</u>, 475 U.S. at 421.  Factors that are considered include:  the defendant's

intelligence and education, see Stawicki v. Israel, 778 F.2d 380, 382-84 (7th Cir. 1985) (defendant with high school equivalent and average intelligence made valid waiver); the defendant's familiarity with the criminal justice system, see id. at 383-84 (waiver valid despite absence of express waiver where defendant had five prior arrests); and the defendant's physical and mental condition at the time of the interrogation, see United States v. Male Juvenile, 121 F.3d 34, 40 (2d Cir. 1997) (defendant's mental disabilities did not preclude finding that defendant knowingly waived his rights); United States v. Guay, 108 F.3d 545, 550 (4th Cir. 1997) ("a defendant may voluntarily waive his rights even when in the hospital, on medication, or in pain"). Additionally, courts must consider the conditions of the interrogation and the conduct of law enforcement officials, including, whether there was physical abuse, the period of restraint in handcuffs and the use of psychologically coercive tactics." Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997). Other probative factors include the location and atmosphere of the interrogation, see Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977), the length of the interrogation, see Berkemer v. McCarty, 468 U.S. 420, 437-38 (1984), and the tone and language used by the police during the questioning, see United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir. 1987).

As discussed above, it is undisputed that the defendant was informed of his Miranda rights and that he refused to sign the waiver form. The refusal to sign a waiver form does not preclude

a finding of waiver where the defendant indicates a willingness to answer questions. North Carolina v. Butler, 441 U.S. 369, 375 (1979); United States v. Spencer, 995 F.2d 10, 12 (2d Cir. 1993). In fact, an explicit statement of waiver is not required to demonstrate a knowing and voluntary waiver. Butler, 441 U.S. at 375. Rather, waiver can be inferred from the actions and words of the defendant. Id. at 373. Lt. Rafferty credibly testified that he read the questions on the waiver form to the defendant and that the defendant indicated he understood his Miranda rights and whether he was willing to answer questions. 1/3/08 Tr. at 16, 91. Accordingly, this Court finds that the defendant waived his rights verbally prior to the interrogation and agreed to be interviewed by Lt. Rafferty.

Further, this Court finds that the defendant's waiver was knowing and voluntary. His express oral waiver of the right to remain silent and of the right to counsel are "strong proof of the validity" of his waiver. Butler, 441 U.S. at 373; see United States v. McDuffie, No. 01 CR 808 (NRB), 2002 WL 654136, at *2 (S.D.N.Y. Apr. 18, 2002); United States v. Murphy, 16 F. Supp. 2d 397, 402 (S.D.N.Y. 1998). Moreover, the defendant has not asserted that there is anything about his characteristics that suggest that he was incapable of making a knowing waiver. Importantly, having been arrested and prosecuted before, the defendant had ample experience to understand the rights he was waiving. See Fare v. Michael C., 442 U.S. 707, 726 (1979) (16½ year old's prior experience with police suggests he understood

_Miranda_ rights); _United States v. Pinion_, 800 F.2d 976, 981 (9th Cir. 1986) ("in view of [defendant's] experience with the arrest and detention processes, his treatment by police cannot be found to have been so intimidating as to have overborne his will"). The fact that the defendant answered the officer's questions, but chose not to sign the waiver form, underscores that the defendant understood his rights and voluntarily agreed to make certain statements. _Cf._ _United States v. Lynch_, 92 F.3d 62, 65 (2d Cir. 1996). In addition, that the defendant was not interviewed until almost 3 hours after his arrest suggests that "he had time to reflect upon his situation and that he freely chose to waive his rights and to speak with [the officers]." _Id._

Nor did the conditions of the defendant's interrogation create a coercive environment. The defendant was questioned in his cell for about half an hour, without handcuffs and with two officers present. There is no evidence that the officers threatened or coerced the defendant into speaking, nor did they make promises of leniency to the defendant. As Lt. Rafferty credibly testified, the tenor of the interview was conversational. 1/3/08 Tr. at 80.

The defendant argues that the fact that he would later sign a waiver during questioning following the search of his grandmother's apartment casts doubt on the government's claim that the defendant actually gave oral consent after refusing to sign a waiver. Def.'s Post Hr'g Mem. at 24-25. However, given the nature of the statements made by the defendant, the brevity

of the first interview and the believable testimony of Lt. Rafferty that the defendant was talkative and willingly gave statements, I find based on the totality of the circumstances, that the defendant voluntarily, knowingly and intelligently waived his right to remain silent.

## Search of Apartment

It is well settled that a warrantless search is "'per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Among the principal exceptions to the warrant requirement are searches on consent by someone authorized to grant consent. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006). The government bears the burden of proving by a preponderance of the evidence that consent is voluntary. Snype, 441 F.3d at 131. The determination whether consent was voluntary must be based on an examination of the "totality of all the circumstances." Schneckloth, 412 U.S. at 227; see Snype, 441 F.3d at 131.

Whether the defendant consented to the search of his bedroom is determined by an objective standard, whether a reasonable person would have understood that the defendant had consented based on his words or conduct. See Florida v. Jimeno, 500 U.S. 248, 251 (1991). Consent "can be found from an individual's words, acts or conduct." United States v. Deutsch, 987 F.2d 878,

883 (2d Cir. 1993) (internal quotation marks and citations omitted). The government argues that the search of defendant's bedroom is valid based on the defendant's oral consent and on the consent signed by Ms. Staley and Ms. Chisholm. According to Lt. Rafferty's testimony, although the defendant refused to sign a consent to search form, Lt. Rafferty understood the defendant to have granted consent based on his statements, "Yo, it's at my grandmother's. You can do whatever you want with the gun. I was just holding it." 1/3/08 Tr. at 62.

While consent need not be expressed in the form of a particular "talismanic phrase," see United States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981), I find that defendant's statements are insufficient to constitute consent to search. I am not satisfied by Lt. Rafferty's testimony at the hearing that he clearly asked for consent to search the defendant's residence or that the defendant gave his consent for the police to do so. The relevant part of his testimony is as follows:

Question:     Okay. So, you tried to get him to sign a consent form. He wouldn't do it. So you believed that to say you can do whatever you want with it was enough to go over there?

Answer:       Verbal consent was fine with me.

Question:     Well, did you ask him ... is it okay with you if we go over to your grandmother's house and pick up the gun?

Answer:       Correct, that's how I took his statements to be.
                            ...
Question:     ...I mean you didn't follow up with him to say okay, does that mean it's okay with you if we go to your house and take it?

```
Answer:          There [were] other statements in there.  I can't
                 tell you my exact statements, but we acknowledged
                 the fact that we were going to go recover the gun,
                 and he acknowledged the fact that he had no
                 problem with us going to get the gun.
```

1/3/08 Tr. at 63.

However, Lt. Rafferty did not have a clear recollection of
what the defendant said and needed "to look at the memo book to
get the exact word[s]." Id. at 62, 63.  He did not
contemporaneously take notes during the interview, but later
recorded in his memo book the four statements he found to be the
"most important." Id. at 64.  The four notations in Lt.
Rafferty's memo book concerned why defendant had a gun and where
he resided rather than whether defendant's consent had been
given.  Def.'s Exh. 4.

The written statement that "[y]ou can do whatever you want,"
in itself, does not suffice in establishing that consent had been
given to a request for consent.  That the defendant had no
interest in the gun is a different matter from whether he
intended to permit the police enter his grandmother's home to
search for a gun in some unspecified location.  Since "consent to
a search is not to be lightly inferred" and "must have been
unequivocal, specific, and intelligently give," I do not find
that the government has established that Chisholm consented to a
search of his residence.  United States v. Como, 340 F.2d 891,
893 (2d Cir. 1965).

Lt. Rafferty did not indicate that he made any attempt to
clarify whether defendant actually intended to grant consent for

a search. This was necessary not only because of the ambiguity of defendant's statement and defendant's failure to tell the officers where in the apartment the gun was located, but also because the defendant had refused to sign a consent form. Rather than asking defendant about the location of the gun, 1/17/08 Tr. at 101-02, the officers proceeded to the defendant's residence. Under these circumstances, I find that the government has not met its burden of proving that a reasonable person would have understood that defendant had granted consent to search his bedroom with those few statements. Contrast Groh v. Ramirez, 540 U.S. 551, 559, 563 and n. 6 (2004) (noting that "the presumptive rule against warrantless searches applies with equal force to searches" conducted pursuant to a warrant failing to specify the items the government sought to seize in part because "officers leading a search team must 'mak[e] sure that they have a proper warrant that in fact authorizes the search and seizure they are about to conduct'").

The government's reliance on United States v. Bunnell, 280 F.3d 46 (1st Cir. 2002), is misplaced. See Gov't.'s Post Hr'g Br. at 19. In Bunnell, unlike here, the defendant clearly indicated consent to a search of his apartment, telling the officers that he wished to turn a gun over to them, accompanying them to his apartment and verbally directing them to the location of the weapon. 280 F.3d at 48. At about the same time, the defendant signed a consent to search form. Id.

Alternatively, the government relies on Ms. Staley's consent to search the defendant's bedroom, which I find, as discussed above, was given by Ms. Staley prior to the start of the search. A third party has the authority to grant consent to a search of a home if that person "(1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." <u>Moore v. Andreno</u>, 505 F.3d 203, 208-09 (2d Cir. 2007) (citing <u>United States v. Davis</u>, 967 F.2d 84, 87 (2d Cir. 1992)); <u>see also</u> <u>United States v. Matlock</u>, 415 U.S. 164, 171-72 (1974). The Supreme Court has explained that the rule rests "on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." <u>Matlock</u>, 415 U.S. at 172 n.7 (collecting cases).

Most courts have found that a parent has the authority to consent to a general search of an adult child's bedroom in a shared residence. <u>See</u>, <u>e.g.</u>, <u>Pratt v. United States</u>, 214 Fed.App'x 532, 535 (6th Cir. 2007); <u>United States v. Lewis</u>, 386 F.3d 475, 480-81 (2d Cir. 2004); <u>United States v. Block</u>, 590 F.2d 535, 541 (4th Cir. 1978); <u>but</u> <u>see</u> <u>United States v. Whitfield</u>, 939 F.2d 1071, 1074-75 (D.C. Cir. 1991); <u>United States v. Howard</u>, 984 F. Supp. 31, 34 (D.D.C. 1997) (grandparent did not have authority to consent). The defendant is Ms. Staley's grandson who lives at

both the apartment Ms. Staley rents and at his girlfriend's place.  1/17/08 Tr. at 128-29.  Ms. Staley testified that there is no lock on the door of the bedroom occupied by the defendant. Even accepting her testimony that she entered the bedroom only to place laundry or mail on his bed, which I did not find credible, Ms. Staley had sufficient unfettered and common authority over the room which contained only furniture that belonged to her. Accordingly, I find that Ms. Staley had actual authority to grant consent to a general search of defendant's bedroom and that the officers reasonably believed that she had access and control over the premises.  See <u>Lewis</u>, 386 F.3d at 481.

Next, the government bears the burden of proving that the consent was voluntary given the totality of all the surrounding circumstances.  See <u>Snype</u>, 441 F.3d at 131.  This determination is also an objective one based on what a reasonable person would have understood.  <u>Jimeno</u>, 500 U.S. at 250; <u>Illinois v. Rodriguez</u> 497 U.S. 177, 185-86 (1990); <u>United States v. Garcia</u> 56 F.3d 418, 423 (2d Cir. 1995).  Among the pertinent factors courts consider are the consenting party's age, education and intelligence. <u>United States v. Sanchez</u>, 635 F.2d 47, 58 (2d Cir. 1980) (citing <u>Schneckloth</u>, 412 U.S. at 227).  The failure to inform the consenting party of the party's right to refuse to grant the consent is a factor, but is not in itself dispositive of a lack of voluntariness.  <u>Schneckloth</u>, 412 U.S. at 227; <u>Garcia</u>, 56 F.3d at 422-23.

Both Ms. Staley and Ms. Chisholm each stated that she simply signed the consent without reading it, 1/17/08 Tr. at 118, 141-42, but I also do not find these statements and many of their other statements credible.  The words "Consent to Search" at the top of the consent form they signed were printed in very large typeset and hard to overlook.  See Govt.'s Exh. D.  Although Ms. Staley's signature was shaky, she signed her name over the signature line drawn on the form within the space provided.  Id. In fact, despite her claim she needed glasses, 1/17/08 Tr. at 118, Ms. Staley signed her name in script with letters considerably smaller than those in the words "Consent to Search" at the top of the form and noticeably smaller than the handwritten names "Barbara Chisolm/Miriam Staley" just below "Consent to Search" and the handwritten words "rear bedroom/living area" further down the form.  Govt.'s Exh. D.  She also acknowledged that she previously held a job that required her to read and write English.  1/17/08 Tr. at 120.  Although she testified that she was frightened and nervous, she admitted that the officers were polite.  Id. at 127.  The presence of four officers in the apartment would not, in itself, support any claim of coercion.  Garcia, 56 F.3d at 423 (three officers after arrest); United States v. Kon Yu-Leung, 910 F.2d 33, 41 (2d Cir. 1990) (six officers).  In any event, Ms. Staley was articulate, tenacious and firm at the hearing and did not appear to be a person easily cowed by most situations, even if she, understandably, was upset by the appearance of the four officers

at her apartment on August 15, 2007. Thus, I find under the totality of the circumstances that Ms. Staley understood and voluntarily signed the consent to search and had authority to consent to a search of the apartment she rented. 1/17/08 Tr. at 121.

However, whether Ms. Staley had the authority to consent to a search of the areas within the defendant's bedroom where evidence was found is a different matter. As the Supreme Court recognized in Randolph, the reasonableness of searches in consent cases rests in part on commonly held social expectations about the authority that co-inhabitants may exercise over each other's property. See Georgia v. Randolph, 547 U.S. 103, 111 (2006). The expectation of privacy accorded to the contents of a container are of the same if not greater magnitude than that accorded to the home generally. Ex parte Jackson, 96 U.S. 727, 733 (1877) ("The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be ... and can only be opened and examined under [a] warrant ... as is required when papers are subjected to search in one's own household"). See also Randolph, 547 U.S. at 135 (Roberts, C.J., dissenting) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his own consent, he is free to place these items in an area over which others do not share access and control, be it a private room or a locked suitcase under a

bed."); <u>Jimeno</u>, 500 U.S. at 253 (Marshall, J., dissenting) ("[A]n individual has a heightened expectation of privacy in the contents of a closed container.") (citation omitted). Therefore, "[a] homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home." <u>United States v. Karo</u>, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring). Relatives with joint access do not automatically have authority to consent to a search of closed containers in a room occupied by a defendant. <u>See</u> <u>United States v. Davis</u>, 332 F.3d 1163, 1169 (9th Cir. 2003) (tenant did not have authority to consent to search of defendant's gym bag in defendant's bedroom); <u>Block</u>, 590 F.2d at 541 (mother had authority to consent to search of son's bedroom but no authority to consent to search of son's footlocker in his bedroom); <u>United States v. Robinson</u>, 999 F. Supp. 155, 162-63 (D. Mass. 1998) (mother had authority to consent to search of adult son's bedroom for items open to view but not a closed vinyl bag in the room or the pockets of a pair of pants in the room); <u>United States v. Orejuela-Guevara</u>, 659 F. Supp. 882, 887-89 (E.D.N.Y. 1987). As the Second Circuit explained, "when considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in <u>the</u> <u>object</u> apart from his expectation of privacy in the home." <u>United States v. Haqq</u>, 278 F.3d 44, 50 (2d Cir. 2002).

The evidence defendant seeks to suppress was found in a dresser in the bedroom, in the pocket of a jacket hanging in the

closet and, out of view, on or in a box on top of the hanging rod in the closet.  Since all of these locations are functionally equivalent to closed containers where the defendant has a heightened expectation of privacy, the government must prove that consent was granted by one who had the requisite authority over the containers sought to be inspected.  The determination of whether a consent to search extends beyond areas that a third party granting consent jointly occupies, has a substantial interest in, or has permission to access is a complex one requiring "layered analysis to identify and accommodate those areas entitled to independent and constitutional protection." Orejuela-Guevara, 659 F. Supp. at 887.

An adult's dresser drawer is generally recognized as a place where a person can place private items and expect them to remain private.  See Randolph, 547 U.S. at 112 ("[W]hen it comes to searching through the bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent...."); Reeves v. Warden, 346 F.2d 915, 924-25 (4th cir. 1965) (mother had no authority to consent to search of son's room, which he regularly occupied, and the bureau in it).  The dresser in Chisholm's bedroom contained his personal effects and some sheets.  1/17/08 Tr. at 83-84.  Officer Gloragille testified that the defendant's bedroom was very neat and there were floral sheets on the bed, as well as neatly folded sheets in a dresser.  1/17/08 Tr. at 82. While the officers were searching the dressers, Ms. Chisholm

called out to both officers not to mess up the room.  Id. at 85.
Ms. Staley also testified that the defendant seldom washed his
own clothes, but admitted that she sometimes would wash his
sheets.  Id. at 125-26.  I did not find credible her testimony
that she did not put away washed laundry, but instead, put folded
laundry on a chair in the bedroom.  Id. at 126.[6]  Since defendant
stayed at both his grandmother's apartment and his girlfriend's
place, id. at 128-29, I find it likely that Ms. Staley would have
put away the defendant's clean laundry into the dresser and
otherwise tidy up the room.  I find under the totality of the
circumstances that Ms. Staley and Ms. Chisolm accessed and
exercised common authority over the furniture in the bedroom and
that defendant had no reasonable expectation of privacy in the
items contained inside the furniture.[7]

On the other hand, the evidence found in the pocket of
defendant's jacket hanging in his bedroom involves different
considerations.  Officer Gloragille testified that the closet
door was partially open and that he found ammunition in one of
the pockets when he patted down the defendant's jacket.  Id. at

---

[6] The transcript for Ms. Staley's testimony was missing the word
"chair."  See 1/17/08 at 126, lns. 11, 12.  However, my hearing notes
indicate that she said "chair."

[7] Officer Gloragille referred to each piece of the furniture
searched in the bedroom as a "dresser."  However, Ms. Staley testified
that the bedroom contained a bed, dresser, night table and television
stand.  The Complaint states that ammunition, marijuana and heroin
were found in a television stand.  See ct. doc. 1 at ¶ 6.
Irrespective of whether the search was of a dresser or television
stand, it was objectively reasonable for the officers to believe that
Ms. Staley and Ms. Chisolm exercised control over the furnishings in
the bedroom.

88-89.  "Pockets, although not 'closed containers,' do historically have a high expectation of privacy...." <u>Robinson</u>, 999 F. Supp. at 163 (finding that mother had no authority to consent to search of son's pants pockets).  However, "[o]bviously not every 'enclosed space' within a room or other area E.g., pockets in clothes, ... can claim independent status as objects capable of search not within reach of the authorized area search." <u>Block</u>, 590 F.2d at 541 n.8.  Rather, "[t]he rule has to be one of reason that assesses the critical circumstances indicating the presence or absence of a discrete expectation of privacy with respect to the particular object...." <u>Id.</u>  While Ms. Staley may have had access to the bedroom and closet, the government offers no evidence that Ms. Staley had permission or interest in arranging the items in the closet, let alone in going through the pockets of the defendant's clothes.  Nor is there proof that Ms. Staley or Ms. Chisholm exercised common authority over the defendant's clothes hanging in his closet.  I thus find that Ms. Staley did not have the authority to consent to a search of his jacket pockets.

Even if Ms. Staley did not have the actual authority to consent to the search, the search would be valid if the officers reasonably concluded that she had the requisite authority.  <u>See</u> <u>Rodriguez</u>, 497 U.S. at 179, 188-89.  The government argues that the officers reasonably believed that Ms. Staley and Ms. Chisholm had access and control over the bedroom, the dressers and the closet.  Govt.'s Post Hr'g Br. at 22.  However, Lt. Rafferty and

Officer Gloragille both testified that they knew it was Ms. Staley's apartment and that Ms. Chisholm lived elsewhere. 1/3/08 Tr. at 26, 68; 1/17/08 Tr. at 77-78, 138. Lt. Rafferty also testified that although he observed items throughout the apartment and in the bedroom that appeared to belong to an older man, he did not recall whether the closet contained articles of women's clothing and could not tell whether all of the clothing in the closet belonged to the defendant. 1/03/08 Tr. at 91-92. However, given the fact that Ms. Staley's husband died in 1999, it is unlikely that the clothing in the bedroom closet belonged to her late husband. Thus, there is an absence of evidence that either Ms. Chisholm or Ms. Staley had authority over the defendant's personal possessions contained in clothes hanging in the closet, notwithstanding Ms. Chisholm's eagerness to assist at the start of the search and my earlier finding that the defendant had no expectation of privacy with respect to the dressers. Unlike dressers where defendant's relatives placed clean laundry, neither Ms. Staley nor Ms. Chisholm would have any reason in the course of straightening up the bedroom to look in the pockets of clothes hanging in the closet. Nor do I find it reasonable for the officers to believe that either Ms. Staley or Ms. Chisholm had permission to access or had any interest in items kept in the pockets of jackets hanging in the closet. Under the circumstances, the officers had no reasonable basis to believe that Ms. Chisholm or Ms. Staley had authority over the

defendant's personal possessions absent further inquiry. Rodriquez, 497 U.S. at 188-89.

For similar reasons, I also find that the government has failed to establish that Ms. Staley had actual or apparent authority to consent to a search inside the closet, whether to view the top or the contents of the box which was placed in the left side of the closet on top of the closet rod. While part of the box can be seen when the closet door is open fully, as depicted in the two photographs admitted into evidence, the top of the box can not be readily seen. There is no evidence that Ms. Staley or Ms. Chisholm would have any interest in accessing the top of a box inside the closet since, given the placement of the box, items on top or inside the box did not affect the order and neatness of the bedroom. To be sure, this is even more so with respect to the contents of the box. There are simply no facts to show that Ms. Staley had permission to look inside the box, common authority over the box or any interest in its contents. See Orejuela-Guevara, 659 F. Supp. at 888. The defendant had a heightened expectation of privacy in the contents of the box and did not assume the risk that his grandmother would consent to its search.

The government points to United States v. Ross, 456 U.S. 798 (1982), for the proposition that "when police are searching for [a] gun, their valid third-party consent search is only limited to areas in which these items might be hidden regardless of the defendant's enhanced expectation of privacy in certain areas or

containers."  Govt.'s Post Hr'g Br. at 23.  Although the Supreme Court in <u>Ross</u> stated that "when a legitimate search is underway, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers ... must give way...."  456 U.S. at 821, that <u>dicta</u> is inapplicable here.  <u>Ross</u> did not involve a third-party consent search and the warrantless search in <u>Ross</u> was made in the context of a lawful search of an automobile based on probable cause that contraband was concealed in an automobile thereby permitting a search of containers.

In sum, I find that because Ms. Staley had authority to consent to search of the items in the dressers in the room and knowingly and voluntarily gave consent before the government conducted the search, the marijuana and heroin found in the dresser should not be suppressed.  However, because I do not find that the officers had actually obtained consent or could reasonably believe that they had consent from someone with authority to consent to a search of clothing hanging in the closet or a search of the box over the closet rod in defendant's bedroom, I find that the gun and ammunition seized from the clothing pocket and in the container should be suppressed.

<u>Post-Search Statements</u>

Last, the defendant argues that the statements he made after the search should be suppressed because his statements resulted from being confronted by Lt. Rafferty with the results of the illegal search.  As the Second Circuit has recognized, "the

question of whether a person's statement has been purged of the taint of prior official illegality "does not hinge on a simple 'but for' analysis, but rather 'must be answered on the facts of each case.'" Snype, 441 F.3d at 134 (internal quotation marks and citations omitted). The relevant factors in this determination are "whether a Miranda warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." United States v. Thompson, 35 F.3d 100, 105 (2d Cir. 1994) (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)); see also Kaupp, 538 U.S. at 633. The first factor is most relevant where the person giving consent is in custody. Snype, 441 F.3d at 134.

There is no dispute that the defendant did formally waive Miranda rights prior to his post-search interview later in the day. But he also made statements to Lt. Rafferty when he was re-arrested at 5:30 p.m. on further charges before the warnings were given. 1/3/08 Tr. at 32 (statement that he told the police they could do whatever they wanted with the gun and, with respect to the drugs found, that he was only trying to make a couple of dollars). On the other hand, the illegality involved in searching the items in the closet does not amount to flagrant misconduct given the complexities of the legal issues in determining whether authority to consent had been obtained. Nonetheless, given the proximity in time of the illegal search

that yielded the gun and ammunition to the post-search statements of the defendant and the lack of intervening circumstances, I find that any of the defendant's post-search statements concerning the gun or ammunition are not purged of the taint of the unlawful search of the items in the closet. <u>See</u> <u>United States v. Restrepo</u>, 890 F. Supp. 180, 198 (E.D.N.Y. 1995) (where a confession follows an illegal search, "it is even more apparent ... that giving the <u>Miranda</u> warnings will not break the causal chain, for these warnings 'do not advise [the defendant] whether the evidence he is confronted with is unlawfully obtained or whether it will be admissible at trial'") (citations omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, I recommend that the defendant's motion to suppress: 1) his statements prior to the search of the apartment be denied; 2) his statements made after the search of the apartment be granted; 3) the physical evidence found in the dresser be denied; and, 4) the physical evidence found in the closet be granted.

This report and recommendation will be electronically filed and notice electronically sent to the parties on this date. Any

objections to this Report and Recommendation must be electronically filed, with a courtesy copy sent to Judge Garaufis, by November 12, 2008. Failure to file objections within the specified time waives the right to appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

      **SO ORDERED.**

Dated: Brooklyn, New York
      October 29, 2008

                   /s/
                  MARILYN D. GO
                  UNITED STATES MAGISTRATE JUDGE