UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

   UNITED STATES OF AMERICA

                                                              **MEMORANDUM & ORDER**

                                                              **07-CR-795 (NGG) (MDG)**


              -against-



   MARQUISE CHISHOLM,



                          Defendant.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

        Before the court is a Report and Recommendation ("R&R") issued by Magistrate Judge

Marilyn Dolan Go recommending that Defendant's Motion to Suppress Physical Evidence and

Statements be granted in part and denied in part.  (R&R (Oct. 29, 2008, as corrected on Oct. 30,

2008), Docket Entry #25; Def. Mot. to Suppress, Docket Entry #12.)  Defendant Marquise

Chisholm ("Defendant" or "Mr. Chisholm") and the Government filed timely objections, and

each party responded to the other's objections.  (Docket Entries #27-30.)  For the reasons

discussed below, I adopt Judge Go's thorough and well-reasoned R&R in its entirety, subject to

clarification regarding the statements made by Defendant after he was confronted with evidence

seized during the search of his bedroom.

   **I.    Standard**

        Pursuant to Section 636(b)(1) of Title 28 of the United States Code and Rule 72(b) of the

Federal Rules of Civil Procedure, the district court must conduct <u>de novo</u> review of those

portions of the R&R to which the parties have objected.  The district court may not reject a

proposed finding of a magistrate judge that rests on a credibility finding, however, without

personally hearing live testimony from the witnesses whose testimony is determinative. <u>Carrion v. Smith</u>, --- F.3d ----, 2008 WL 5120120, at *7 (2d Cir. Dec. 8, 2008); <u>Cullen v. United States</u>, 194 F.3d 401, 407 (2d Cir. 1999). Portions of the R&R to which the parties have not objected are reviewed for clear error. <u>See</u> <u>Urena v. New York</u>, 160 F. Supp. 2d 606, 609-10 (S.D.N.Y. 2001).

## II. Discussion

Mr. Chisholm seeks to suppress physical evidence seized from his person and from his bedroom in his grandmother's apartment as well as his statements to police officers on August 15, 2007. He contends that all his statements and the evidence seized were the fruits of an unlawful search and arrest. (Def. Mot. 1-2.) He also claims that no valid consent was given to search his bedroom, which was searched in violation of his rights under the Fourth Amendment, and that his initial statements to officers at the 73rd Precinct ("the precinct") were obtained in violation of his rights under the Fifth Amendment. (<u>See</u> <u>id</u>.)

The court presumes familiarity with the underlying facts as set forth in Judge Go's R&R. (<u>See</u> <u>generally</u> R&R 2-21.) Judge Go determined that when Mr. Chisholm was questioned by police officers outside of 80 Osborn Street in Brooklyn, he consented to a search of his person, and that he was lawfully arrested for possession of the marijuana found in his pockets during the search. (<u>See</u> R&R 26, 3, 6.) She found that when Mr. Chisholm was taken back to the precinct, he waived his <u>Miranda</u> rights prior to being questioned by Lt. Rafferty. (R&R 29.) She also found that while Mr. Chisholm was being questioned at the precinct, he did not consent to a search of his bedroom at his grandmother's apartment. (R&R 34.) Judge Go determined that when the police went to the apartment, Mr. Chisholm's grandmother consented to a search of Defendant's bedroom, and that her access and common authority over the bedroom extended to

the contents of the bedroom furniture but not to certain locations in the closet where evidence was found. (R&R 34, 45.) Accordingly, Judge Go recommended that the Motion to Suppress 1) statements made to police prior to the search of Defendant's bedroom be denied; 2) drugs and related paraphernalia found in his dresser in his bedroom be denied; 3) a gun and ammunition found in his bedroom closet be granted; and 4) statements after the search of the apartment regarding the gun be granted. (R&R 47.)

The parties object to all of Judge Go's conclusions except for the determination that Mr. Chisholm was lawfully searched and arrested outside 80 Osborn Street. (R&R 26.) I have reviewed this determination for clear error and I found none. I address the remaining objections in turn.

### A. Judge Go's Credibility Determinations

Regarding the initial search and arrest of Mr. Chisholm, Judge Go found that Lt. Rafferty and Officer Gloragille had, "at best, imperfect memories of that particular arrest." (R&R 9.) Rather than accepting the officers' version of the circumstances surrounding the initial search and arrest, Judge Go credited the testimony of Defendant's witness, Taiquana Hazel, despite Ms. Hazel's admitted friendship with Defendant and his girlfriend. (See R&R 6-7, 9.) Judge Go noted that Lt. Rafferty and Officer Gloragille appeared truthful, but their testimony about the initial search and arrest conflicted with the facts set forth in the Complaint, Officer Gloragille's testimony before a federal grand jury, and the Government's description of the facts in its response to Defendant's Motion to Suppress. (See R&R 7-8.) Judge Go noted the "hazy and conflicting recollections of the officers relying on incomplete notations in their memo books" regarding the initial search and arrest, although she did not make an explicit adverse credibility finding regarding the officers' testimony. (R&R 7 n.3.)

Judge Go credited the officers' versions of subsequent events, however, over an affidavit of Mr. Chisholm and the testimony of Barbara Chisholm, Defendant's mother, and Miriam Staley, Defendant's grandmother. Specifically, Judge Go found that Lt. Rafferty credibly testified about the questioning of Defendant at the precinct, and she credited his testimony over the version of events set forth in Mr. Chisholm's affidavit, given that Mr. Chisholm did not testify at the suppression hearing. (See R&R 10-11.) She also found Lt. Rafferty and Officer Gloragille's testimony regarding the search of Mr. Chisholm's bedroom more credible than that of Ms. Chisholm and Ms. Staley. (R&R 17-18.) She credited Lt. Rafferty's testimony that Ms. Staley signed a consent-to-search form before the officers searched Defendant's bedroom. (R&R 18.) In contrast, she found that Ms. Chisholm and Ms. Staley were not credible when they testified that they did not enter Defendant's bedroom, and that both women were "overly concerned about not saying anything that undermined the defendant's contention that consent to search was not properly obtained." (R&R 17-18.)

Defendant contends in his Objections that because Judge Go did not credit the officers' version of events regarding the initial search and arrest, she should not have credited the officers' testimony concerning subsequent events. (Def. Obj. 17-20, Docket Entry #28.) Judge Go did not make an adverse credibility finding with respect to the officers, however, and she found Lt. Rafferty's testimony "truthful" (R&R 7), "credible" (id. at 11, 13, 17, 18, 19), and "consistent" (id. at 19). Contrary to Defendant's assertions, Judge Go made no finding that the officers "fabricated" testimony to justify their arrest of Defendant, that they were "willing to lie under oath," or that their testimony was "patently false." (Def. Obj. 15, 16, 18.) Even when an aspect of a witness's testimony gives the court pause, a court may still find such a witness credible and credit his testimony. See, e.g., United States v. Medina, 301 F. Supp. 2d 322, 329 (S.D.N.Y.

4

2004.)  Defendant's Objections also ignore Judge Go's explicit finding that the testimony of Ms.

Staley and Ms. Chisholm was not credible.  (See R&R 17-18.)

After reviewing the transcripts of the suppression hearing and the parties' exhibits, I defer

to Judge Go's credibility determinations, which are consistent with my review of the record.

Therefore, Defendant's objections to Judge Go's credibility determinations, and findings of fact

based on credibility determinations, are denied.

### B.  Mr. Chisholm's Post-Arrest Statements at the Precinct

After Mr. Chisholm was arrested and brought to the precinct, it is undisputed that he was

informed of his Miranda rights and refused to sign a Miranda waiver form.  (R&R 28.)  Judge Go

found that Lt. Rafferty credibly testified that Mr. Chisholm answered in the affirmative to each

question on the waiver form, including his understanding of his rights.  (R&R 12; 1/3/08 Tr. 16,

91.)  Lt. Rafferty testified that Mr. Chisholm agreed to talk to him and did not ask for an

attorney.  (Id.; 1/3/08 Tr. 16.)  Because Mr. Chisholm refused to sign the waiver form, Lt.

Rafferty wrote "refused" on the waiver form's signature line.  (Id.; 1/3/08 Tr. 16.)  When asked

about a shooting that had happened several weeks previously, Mr. Chisholm denied that he was

involved in a shooting, but stated that he kept a gun at the apartment he shared with his

grandmother at 537 Bradford Street.  (Id.; 1/3/08 Tr. 17-18.)  During the interview, which took

place three hours after Mr. Chisholm's arrest, Mr. Chisholm remained in his cell and was not

handcuffed.  (Id.; 1/3/08 Tr. 90.)  Lt. Rafferty spoke to him in a conversational tone and the

interview lasted for approximately 35-40 minutes.  (Id.; 1/3/08 Tr. 90, 58.)  It is undisputed that

later in the evening, following the search of his bedroom, Mr. Chisholm signed a Miranda waiver

form.  (R&R 21; 1/17/08 Tr. 43-44; Def. Ex. 9.)

The government bears the burden of proving the validity of a Miranda waiver. United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995). The court must examine the totality of the circumstances. Moran v. Burbine, 475 U.S. 412, 421 (1986). The refusal to sign a waiver form does not preclude a finding of waiver where a defendant indicates a willingness to answer questions. See United States v. Spencer, 995 F.2d 10, 12 (2d Cir. 1993) (finding valid waiver despite defendant's failure to sign waiver form when defendant told agents he was willing to answer questions); North Carolina v. Butler, 441 U.S. 369, 375 (1979).

Judge Go found that, based on the totality of the circumstances, Mr. Chisholm voluntarily, knowingly, and intelligently waived his right to remain silent by verbally agreeing to be interviewed by Lt. Rafferty. (R&R 31, 29.) She found that his express oral waiver of the right to remain silent was "strong proof" of the validity of the waiver, Butler, 441 U.S. at 373, and that Mr. Chisholm did not assert that he has any characteristics suggesting that he was incapable of making a knowing waiver. (R&R 29.) Judge Go noted that Mr. Chisholm had been arrested and prosecuted before, giving him ample experience to understand the rights he was waiving. (R&R 29, citing Fare v. Michael C., 442 U.S. 707, 726 (1979).) She further noted that the conditions of Defendant's interrogation did not create a coercive environment, and as Lt. Rafferty credibly testified, the tone of the interview was conversational. (R&R 30, 1/3/08 Tr. 80.) That Mr. Chisholm signed a Miranda waiver form later in the evening "casts doubt on the government's claim that the defendant actually gave oral consent after refusing to sign a waiver," but "given the nature of the statements made by the defendant, the brevity of the first interview and the believable testimony of Lt. Rafferty that the defendant was talkative and willingly gave statements," Judge Go found the waiver valid. (R&R 30-31.)

In his Objections, Mr. Chisholm raises no new argument regarding the waiver of his Miranda rights, repeating – verbatim – his argument that his later written waiver undermines the Government's claim that he orally waived his Miranda rights earlier in the day.  (Def. Obj. 17; see Def. Post-Hr'g Mem. 24-25, Docket Entry #17.)  I defer to Judge Go's determination that Lt. Rafferty's testimony concerning Defendant's willingness to waive his rights and answer questions was credible, and agree with her conclusion that while the signing of the second waiver form "casts doubt" on the Government's claim, under the totality of the circumstances, Mr. Chisholm did waive his rights, and that he did so knowingly, voluntarily, and intelligently.  I thus adopt this portion of the R&R in full.

### C.  Consent to Search Mr. Chisholm's Bedroom in his Grandmother's Apartment

"Although warrantless searches of private property are generally presumed to be unreasonable, the law recognizes certain exceptions, for example, when the search is conducted pursuant to the consent of an authorized person."  United States v. Snype, 441 F.3d 119, 130-131 (2d Cir. 2006); see Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Consent may validly be granted by the individual whose property is to be searched, or by a third party who possesses common authority over the premises. See United States v. Matlock, 415 U.S. 164, 171 (1974).  The burden is on the government to prove by the preponderance of the evidence that consent was voluntary, and the determination must be based on the totality of the circumstances.  Snype, 441 F.3d at 131.

It is undisputed following the initial questioning of Defendant at the precinct, the police officers went to Ms. Staley's apartment, where Defendant lived, and conducted a search of Defendant's bedroom without a warrant.  (R&R 13.)  The search of the apartment took about

thirty minutes, and the officers left the apartment at approximately 5:00 p.m.  (R&R 15; 1/3/08

Tr. 31.)  The Government argues that the warrantless search was valid based on Mr. Chisholm's

oral consent, or in the alternative, on consent forms signed by Miriam Staley and Barbara

Chisholm.[1]  Judge Go found that Mr. Chisholm's statements at the precinct did not constitute

consent to search, but that Ms. Staley nonetheless consented to a search of the bedroom, and that

her access and common authority over the bedroom extended to the contents of the bedroom

furniture but not to certain locations in the closet.[2]  (R&R 33, 45.)  The parties object to these

determinations.

### 1.  Whether Mr. Chisholm Consented to a Search of His Bedroom

Whether Mr. Chisholm consented to a search of his bedroom is determined by an

objective standard – whether a reasonable person would have understood that Mr. Chisholm had

consented.  Florida v. Jimeno, 500 U.S. 248, 251 (1991).  Consent can be inferred from an

individual's "words, acts, or conduct," United States v. Deutsch, 987 F.2d 878, 883 (2d Cir.

1993), and need not be expressed in the form of a particular "talismanic phrase," see United

States v. Buettner-Janusch, 646 F.2d 759, 764 (2d Cir. 1981).  Consent to search is "not to be

lightly inferred" and must be "unequivocal, specific, and intelligently given."  United States v.

Como, 340 F.2d 891, 893 (2d Cir. 1965) (internal citation omitted).

It is undisputed that Defendant had been living at his grandmother's apartment since his

grandfather died in 1999.  (R&R 15; 1/17/08 Tr. 110, 121-22.)   According to Judge Go's

---

[1] The Government argues in its initial opposition to Defendant's Motion that the search was valid based on the consent of Ms. Staley.  (Opp. Mot. Suppress 12, Docket Entry #13.)  In its post-hearing brief, the Government appears to argue that the search was valid based on the consent of Ms. Staley and Ms. Chisholm.  (See Gov't Post-Hr'g Br. 21-22.)

[2] While the R&R's conclusions concern Ms. Staley's authority to consent to search, the R&R contains factual findings and dicta indicating that Ms. Chisholm also had access to and authority over the bedroom furniture but not the locations in the closet where the evidence was found.  (See R&R 42-45.)  As discussed in more detail in Section II.C.2, because Ms. Chisholm's access and authority was at most concurrent with that of Ms. Staley, it necessarily follows from Judge Go's conclusion that Ms. Staley lacked the requisite authority to search specific locations in the closet that Ms. Chisholm also lacked the requisite authority to search those locations.

findings of fact, Mr. Chisholm said that he kept a gun at the apartment he shared with his grandmother and told Lt. Rafferty, "You can do whatever you want with that," but he refused to sign a consent-to-search form.  (R&R 12; 1/03/08 Tr. 18, 20, 62-63.)  On the basis of that statement, Lt. Rafferty believed that Defendant had granted his consent to search the apartment. (R&R 20; 1/3/08 Tr. 20.)  Judge Go found that Lt. Rafferty "did not have a clear recollection of what the defendant said" other than what was written in his memo book.  (R&R 33.)  Lt. Rafferty testified that he did not take notes while he was questioning Mr. Chisholm, but later recorded in his memo book the four statements he found to be "most important," including the statement about the gun, which he wrote down as: "Yo, it's at my grandmother's.  You can do whatever you want with the gun.  I was just holding it."  (R&R 32-33; 1/3/08 Tr. 62-64.)  Lt. Rafferty testified that "I can't tell you my exact statements, but we acknowledged the fact that we were going to go recover the gun, and he acknowledged the fact that he had no problem with us going to get the gun."  (R&R 33; 1/3/08 Tr. 63.)  Judge Go noted that the statements in Lt. Rafferty's memo book concerned why Defendant had a gun and where he resided rather than whether Defendant's consent to search had been given.  (R&R 33; Def. Ex. 4.)  She noted that there was no indication that Lt. Rafferty made any attempt to clarify that Mr. Chisholm actually intended to grant consent for the police to search his residence (R&R 33-34), and that Lt. Rafferty did not ask Mr. Chisholm about the location of the gun in the apartment (R&R 34; 1/17/08 Tr. 101-02). After he finished questioning Mr. Chisholm at the precinct, Lt. Rafferty drove with the other officers to the apartment to recover the gun.  (R&R 13; 1/3/08 Tr. 19, 84.)

Judge Go was "not satisfied by Lt. Rafferty's testimony at the hearing that he clearly asked for consent to search the defendant's residence or that the defendant gave his consent for the police to do so."  (R&R 32.)  She found that Mr. Chisholm's statement "'you can do

whatever you want,' in itself, does not suffice in establishing that consent had been given to a request for consent." (R&R 32.) She found that an attempt to clarify whether Defendant intended to grant consent to search was "necessary not only because of the ambiguity of defendant's statement and defendant's failure to tell the officers where in the apartment the gun was located, but also because the defendant refused to sign a consent form." (R&R 34.) Under these circumstances, she concluded, "the government failed to meet its burden of proving that a reasonable person would have understood that defendant had granted consent to search his bedroom with those few statements." (Id.)

Judge Go distinguished this case from United States v. Bunnell, 280 F.3d 46 (1st Cir. 2002), on which the Government relies. (R&R 34; Gov't Post Hr'g Br. 19, Docket #16.) In Bunnell, the defendant clearly indicated consent to a search of his apartment by telling officers at a convenience store that he wished to turn a gun over to them, accompanying them to his apartment, offering to retrieve the gun himself, and verbally directing them to the location of the weapon. 280 F.3d at 48-49. When other officers arrived at the defendant's apartment at about the same time with a consent form, the defendant signed the form. Id. at 49.

The Government objects to Judge Go's conclusion that Mr. Chisholm did not consent to a search of his bedroom. (See Gov't Obj. 8-10, Docket Entry #27.) The Government again relies on Bunnell, arguing that the district court in that case found consent without the distinctions cited by Judge Go, pointing to the court's conclusion that "Bunnell's initial offer at the store to turn over the weapon and oral invitation to search made at the apartment even before the consent form was tendered make this a straightforward case." 280 F.3d at 49. But here, Mr. Chisholm's statements cannot readily be characterized as an "oral invitation to search." The Government's comparison during oral argument to the facts in United States v. Price, 599 F.2d 494 (2d Cir.

1978), is similarly unavailing.  In <u>Price</u>, law enforcement agents observed the defendant, who was carrying a shoulder bag, exit an airplane.  <u>Id</u>. at 496.  The agents then followed the defendant's taxi in a government vehicle, and followed the defendant into a building, at which point the officers explained that they wanted to ask some questions and check that the luggage belonged to the defendant.  <u>Id</u>. at 496-497.  The defendant replied that the shoulder bag was not his, and then placed the bag on the ground.  <u>Id</u>. at 497.  When the agent told the defendant that he wanted to search the bag but could not do so without a warrant or permission, the defendant said "do what you want with it."  <u>Id</u>.  Unlike the situation in this case, the agent in <u>Price</u> explicitly told the defendant that he wanted to search the bag and unambiguously asked for the defendant's consent to do so.

The Government also objects to the determination that clarification was required to ascertain whether consent had been given, arguing that Judge Go's conclusion "creates a new and high burden for law enforcement."  (Def. Obj. 9.)  While the law does not require "clarification" <u>per se</u>, consent – whether demonstrated by words, acts, or conduct – is determined by whether a reasonable person would have understood consent to have been granted.  <u>Florida v. Jimeno</u>, 500 U.S. 248 at 251.  If a reasonable person would not have found Defendant's statements to constitute consent, more is required to reach an objective threshold.  I agree with Judge Go's finding that the statement "you can do whatever you want" is not tantamount to consent to search Defendant's bedroom, and I adopt this portion of the R&R in full.

**2.  Scope of Third-Party Authority to Consent to the Search of Mr. Chisholm's Bedroom**

A third party has the authority to grant consent to a search of a particular area if that person "(1) has access to the area searched and (2) has either (a) common authority over the area,

(b) a substantial interest in the area, or (c) permission to gain access to the area." Moore v. Andreno, 505 F.3d 203, 208-09 (2d Cir. 2007) (citing United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992)); see also United States v. Matlock, 415 U.S. 164, 171-172 (1974) (explaining that the rule of third-party consent rests on mutual use of the property by persons generally having joint access or control and assumption of the risk that one party might consent to search). As the Supreme Court recognized, the reasonableness of searches in consent cases rests in part on commonly held social expectations about the authority that co-inhabitants may exercise over each other's property. See Georgia v. Randolph, 547 U.S. 103, 111 (2006).

Judge Go found that after the officers arrived at 537 Bradford, Lt. Rafferty asked Ms. Chisholm and Ms. Staley to sign a consent-to-search form and that both signed the form before the officers began the search. (R&R 19; 1/3/08 Tr. 67.) The form indicated that the search was limited to the "rear bedroom" and "living area." (R&R 14; 1/3/08 Tr. 27.) Defendant objects to the finding that Ms. Staley signed the form before the search commenced (Def. Obj. 18), but as discussed above, Defendant' objections with respect to findings of fact based on credibility determinations are denied.

Judge Go found that Ms. Staley had actual authority to consent to a general search of the bedroom because there was no lock on the bedroom door and she had "sufficient unfettered and common authority over the room which contained only furniture that belonged to her." (R&R 36; citing United States v. Lewis, 386 F.3d 475, 480-81 (2d Cir. 2004).) Judge Go found that the officers reasonably believed Ms. Staley had access and control over the premises, and she determined that Ms. Staley's consent was voluntary under the totality of the circumstances. (R&R 38; 1/17/08 Tr. 121). The parties do not object to this determination and I find no error.

Judge Go also determined, however, that Ms. Staley accessed and exercised common authority over the bedroom furniture, including the contents of the dresser, but that she did not have authority to consent to a search of certain locations in the closet where evidence was found – inside the pocket of a jacket hanging in the closet and inside or on top of a box sitting on the hanging rod in the closet.[3] (R&R 45.) The parties object and vigorously dispute whether Ms. Staley had actual or apparent authority to consent to a search of the locations where evidence was found.

A homeowner's "consent to search of the home may not be effective consent to a search of a closed object inside the home." United States v. Karo, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring); see also Randolph, 547 U.S. at 135 (Roberts, C.J., dissenting) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his own consent, he is free to place these items in an area over which others do not share access and control, be it a private room or a locked suitcase under a bed.") (emphasis in original). The Second Circuit has explained that "when considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in the object apart from his expectation of privacy in the home." United States v. Hagg, 278 F.3d 44, 50 (2d Cir. 2002) (emphasis in original).

Relatives with joint access do not automatically have authority to consent to a search of closed containers in a room occupied by a defendant. See United States v. Orejuela-Guevara,

---

[3] The R&R is not entirely clear on whether the gun was found on top of or inside the box on the hanging rod in the closet. In her findings of fact, Judge Go concluded, based on conflicting testimony and photographs of the closet, that:

> In the absence of clearer evidence, I cannot find that the gun was visible simply sitting on top of the box in the closet when recovered by the officers. It is more likely that it was inside the box in the closet, a far more logical place for the defendant to store a weapon in his grandmother's home, and that the gun was found inside the box in the course of the search.

(R&R 20.) Judge Go later noted that the gun was found "out of view, on or in a box on top of the hanging rod in the closet." (R&R 40.)

659 F. Supp. 882, 887-89 (E.D.N.Y. 1987) (holding that joint occupant had no common authority over or implied right of access to containers in co-occupant's closet); see also United States v. Davis, 332 F.3d 1164, 1169 (9th Cir. 2003) (tenant did not have authority to consent to search of defendant's gym bag in defendant's bedroom); United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978) (mother had authority to consent to search of son's bedroom but no authority to consent to search of son's footlocker in the bedroom); United States v. Robinson, 999 F. Supp. 155, 162-63 (D. Mass. 1998) (mother had authority to consent to search of adult son's bedroom for items open to view but not a closed vinyl bag in the room or the pockets of a pair of pants in the room). Once a search extends beyond the common areas of the jointly occupied premises, the determination of whether a third party has the requisite authority to consent requires "layered analysis to identify and accommodate these areas entitled to independent constitutional protection." Orejuela-Guevara, 659 F. Supp. at 887. An adult's dresser drawer is generally recognized as a place where a person can place private items and can expect them to remain private. See Randolph, 547 U.S. at 112 ("[W]hen it comes to searching through the bureau drawers, there will be instances in which even a person clearly belonging on the premises as an occupant may lack any perceived authority to consent . . . .").

Judge Go generally accepted the officers' testimony regarding the search of Mr. Chisholm's bedroom, and credited their testimony over the testimony of Ms. Chisholm and Ms. Staley. Both Lt. Rafferty and Officer Gloragille testified that they knew it was Ms. Staley's apartment and that Ms. Chisholm lived elsewhere. (R&R 42; 1/3/08 Tr. 26, 28; 1/17/08 Tr. 77-78, 138.) Lt. Rafferty testified that Ms. Chisholm directed the officers to Defendant's bedroom. (R&R 14; 1/3/08 Tr. 27, 29, 65.) During the search, Ms. Chisholm attempted to help the officers by "pulling stuff out of the room," "going through the dresser," and "point[ing] to the closet,"

until Lt. Rafferty asked her to allow the officers to conduct the search.  (R&R 14-15; 1/3/08 Tr. 28.)  Officer Gloragille testified that the bedroom was neatly kept and contained a bed in the middle of the room and a dresser on either side of the bed.  (R&R 15, 1/17/08 Tr. 82.)  In the dresser located to the right of the bed, Officer Gloragille observed neatly folded sheets and clothes.  (R&R 15; 1/17/08 Tr. 83-84.)  Officer Gloragille joined Officer Mitchell in a search of the dresser to the left of the bed and found heroin, marijuana, and a spoon which he believed to be drug paraphernalia.  (R&R 15; 1/17/08 Tr. 85-86.)  The officers also searched the bedroom closet, and Officer Gloragille found ammunition in the pocket of a jacket hanging in the closet. (R&R 15; 1/17/08 Tr. 88-90.)  A gun and ammunition were also retrieved from the closet, on or inside a box sitting on the closet rod.[4]  (See R&R 19-20.)  Ms. Staley testified that Mr. Chisholm had never asked her not to open his dresser or closet.  (R&R 16; 1/17/08 Tr. 16.)

Judge Go found that Ms. Staley was not believable when she first testified that she did not go into Mr. Chisholm's bedroom and later testified that she would quickly enter the bedroom and simply put Mr. Chisholm's clean laundry and mail onto the bed.  (R&R 18; 1/17/08 Tr. 122-26.)  Judge Go found it "likely that Ms. Staley would have put away the defendant's clean laundry into the dresser and otherwise tidy up the room."  (R&R 41.)  Regarding Ms. Chisholm's testimony, while Judge Go accepted Ms. Chisholm's testimony that she told the officers not to mess up Defendant's bedroom during the search (R&R 17, 1/17/08 Tr. 149), she "did not find credible Ms. Chisholm's testimony that she does not enter the defendant's bedroom and was last in the bedroom when her father was alive, even though she admitted that she helped her mother straighten up the apartment."  (R&R 18; 1/17/08 Tr. at 147-48.)  Judge Go thus found that Ms. Staley and Ms. Chisholm accessed and exercised common authority over the furniture in the

---

[4] Judge Go did not credit Officer Gloragille's testimony that the gun was on the closet shelf (R&R 15; 1/17/08 Tr. 89), because photographs of the closet taken during the search and by Defendant in November 2007 indicated that it had no shelf, only a hanging rod on which was perched a large cardboard box (R&R 19; Gov't Ex. F; Def. Ex. 12).

bedroom and that Defendant had no reasonable expectation of privacy in the items contained inside the furniture.[5] (R&R 41.)

Defendant objects to Judge Go's conclusion that Ms. Staley had access to the dresser where the drugs were found, contending that while the evidence shows that Ms. Staley may have accessed Mr. Chisholm's dresser on the right side of the bed – because that was where the bed sheets were kept – there was no evidence presented at the hearing that Ms. Staley similarly accessed the dresser on the left side of the bed. (Def. Obj. 20.) Defendant argues that "the very fact that Mr. Chisholm kept heroin and marihuana in the left dresser implies that it was an area he considered entirely private and was not accessed by his grandmother." (Id.) I disagree. I defer to Judge Go's finding, based on her credibility determinations, that that Ms. Staley had access to and authority over the bedroom furniture, not just the dresser in which sheets were kept. Even if a distinction could be drawn in retrospect between the dresser in which sheets were kept and the dresser in which drugs were found, I find that the police reasonably relied on Ms. Staley's "apparent authority" to consent to a search of the bedroom furniture, Illinois v. Rodriguez, 497 U.S. 177, 186 (1990), which renders such a search constitutional, Moore, 505 F.3d at 209.

Notwithstanding her conclusion regarding the contents of the bedroom furniture, Judge Go concluded that Ms. Staley and Ms. Chisholm did not have actual or apparent authority to consent to a search inside the closet. (See R&R 43, 44.) With respect to the ammunition found inside the pockets of Mr. Chisholm's jacket hanging in his bedroom closet, Judge Go found that "[w]hile Ms. Staley may have had access to the bedroom and closet, the government offers no

---

[5] Judge Go noted that Officer Gloragille referred to each piece of the furniture searched in the bedroom as a "dresser," but Ms. Staley testified that the bedroom contained a bed, dresser, night table, and television stand. (R&R 41 n.7.) She noted that the Complaint states that the drugs were found in a television stand. (Id.; Compl. ¶ 6, Docket Entry #1).) Judge Go found that "[i]rrespective of whether the search was of a dresser or television stand, it was objectively reasonable for officers to believe that Ms. Staley and Ms. Chisholm exercised control over the furnishings in the bedroom." (R&R 41.)

evidence that Ms. Staley had permission or interest in arranging the items in the closet, let alone in going through the pockets of the defendant's clothes. Nor is there proof that Ms. Staley or Ms. Chisholm exercised common authority over the defendant's clothes hanging in his closet." (R&R 42.) She thus concluded that Ms. Staley did not have actual authority to consent to a search of Defendant's jacket pockets. (Id.)

Judge Go also determined that Ms. Staley did not have apparent authority, finding that the officers had no reasonable basis to conclude that Ms. Staley had authority to consent to a search of Defendant's jacket pockets. (R&R 42.) Lt. Rafferty testified that although he observed items throughout the apartment and in the bedroom that appeared to belong to an older man, he did not recall whether the closet contained articles of women's clothing and could not tell whether all of the clothing in the closet belonged to Mr. Chisholm. (R&R 43; 1/3/08 Tr. 91-92.) Judge Go found, however, that given that Ms. Staley's husband died in 1999, it is unlikely that the clothing in the bedroom closet belonged to Ms. Staley's late husband. (R&R 43.) Therefore, she found that "there is an absence of evidence that either Ms. Chisholm or Ms. Staley had authority over the defendant's personal possessions contained in clothes hanging in the closet." (Id.) She found that unlike the "dressers where defendant's relatives placed clean laundry," neither Ms. Staley nor Ms. Chisholm "would have any reason in the course of straightening up the bedroom to look in the pockets of clothes hanging in the closet"; therefore, it was unreasonable for the officers to believe that either woman had "permission to access or had any interest in items kept in the pockets of jackets hanging in the closet." (Id.)

For similar reasons, Judge Go concluded that the Government failed to establish that Ms. Staley had actual or apparent authority to consent to a search inside the closet, whether to view the top or the contents of the box which was placed on top of the closet rod. (R&R 44.) She

found that "there is no evidence that Ms. Staley or Ms. Chisholm would have any interest in accessing the top of a box inside the closet since, given the placement of the box, items on top or inside the box did not affect the order and neatness of the bedroom." (R&R 44.) She also found that Ms. Staley had even less of an interest in the contents of the box, and "there are simply no facts to show that Ms. Staley had permission to look inside the box, common authority over the box or any interest in its contents." (R&R 44, citing Orejuela Guevara, 659 F. Supp. at 888.)

The Government objects to Judge Go's conclusions with respect to the search of the closet. In particular, the Government argues that there is no logical basis for making a distinction between the bedroom furniture and the closet, because Ms. Staley's authority to put laundry in Mr. Chisholm's dresser logically extended to hanging Mr. Chisholm's clothes in the closet. (Gov't Obj. 11.) The Government also argues that even if there were a nuanced distinction to Ms. Staley's actual authority, the officers reasonably relied on Ms. Staley's and Ms. Chisholm's apparent authority to search the closet.[6] (Id.)

The court denies the Government's objections to Judge Go's distinction between the bedroom furniture and the closet. When considering the legality of a search of an object within a home, the proper focus is on Defendant's "expectation of privacy in the object" being searched. Hagg, 278 F.3d at 50 (emphasis in original). This case is similar to the search of the third bedroom in Orejuela-Guevara, 659 F. Supp. at 888-89, which concerned the scope of authority of a person who lived in one bedroom of a shared apartment to consent to a search of the apartment's second and third bedrooms. Id. The court concluded that the consenting co-occupant had the authority to consent to a search of the second bedroom, because the resident of

---

[6] In addition, the Government contends that the officers' "reasonable conclusions about the defendant's privacy expectations were colored by his statements" at the precinct regarding the gun. (Gov't Obj. 11.) In light of the court's conclusion that it was unreasonable for the officers to construe Mr. Chisholm's statements at the precinct as consent to search his bedroom, this objection is denied.

that bedroom was present during the search and sat quietly as her co-occupant signed the consent to search form. Id. at 886. The court found, however, that the co-occupant's consent did not extend to a search inside a bag and briefcase in the third bedroom's closet. Id. at 888. The court found that even if the co-occupant's consent had been sufficient to validate entry into that bedroom or closet, there was no evidence to support the conclusion that the consenting co-occupant enjoyed common authority over or an implied right of access to the containers in the closet. Id. Even if Ms. Staley had actual or apparent authority to hang clean clothes in Defendant's closet, I agree with Judge Go that there is no evidence that she had any authority over or interest in rummaging through the pockets of Defendant's jackets. Nor is there any evidence that Ms. Staley or Ms. Chisholm had authority over or an interest in what was on or in a box perched on the closet rod, especially given Judge Go's finding that that Ms. Staley's access to Defendant's bedroom was essentially limited to tidying up the room and putting away clean laundry. (R&R 41.) Ms. Staley thus did not have the required actual or apparent authority to grant consent to a search of the locations of the closet where evidence was seized, as required by Moore v. Andreno, 505 F.3d at 208-09. The Government's objections with respect to the search of the closet are thus denied, and this portion of the R&R is adopted in full.

### D. Mr. Chisholm's Post-Search Statements at the Precinct

After the officers searched Defendant's bedroom at his grandmother's apartment, they returned to the precinct to re-arrest Defendant based on the new evidenced that was recovered. (R&R 20; 1/3/08 Tr. 31-32.) Defendant was re-processed at approximately 5:30 p.m. (R&R 20; 1/3/08 Tr. 32.) When told that the officers recovered the gun, Defendant told the officers, "I told you, you could do what you want with that." (R&R 20; 1/3/08 Tr. 32.) When told about the narcotics that were recovered, Defendant said "I'm just trying to make a couple of dollars."

(R&R 20; 1/3/08 Tr. 32.)  At 10:45 p.m., Mr. Chisholm executed a <u>Miranda</u> waiver form, and he was interviewed by two detectives from the Gun Enhancement Unit.  (R&R 20-21; 1/17/08 Tr. 43-44; Def. Ex. 9.)  Defendant seeks to suppress the statements regarding the gun and drugs made prior to his <u>Miranda</u> waiver, contending that the statements resulted from being confronted with the results of an illegal search.  (Def. Mot. 7.)

It is well-established that evidence seized after an illegal search must be suppressed unless the government shows that it, in fact, resulted from "an intervening independent act of free will" sufficient "to purge the primary taint of the unlawful invasion." <u>Wong Sun v. United States</u>, 371 U.S. 471, 486 (1963).  As the Second Circuit has explained, "[t]he question of whether a person's statement has been purged of the taint of prior official illegality 'does not hinge on a simple "but for" analysis, but rather 'must be answered on the facts of each case.'" <u>Snype</u>, 441 F.3d at 134 (citations omitted).  The Supreme Court has identified the following factors as relevant to that consideration:  "(1) the giving of <u>Miranda</u> warnings, (2) the "'temporal proximity' " of the illegal entry and the alleged consent, (3) "'the presence of intervening circumstances,' " and (4) "'the purpose and flagrancy of the official misconduct.'" <u>Id</u>. (citations omitted).  The first factor is most relevant where the person giving consent is in custody.  <u>Id</u>.

Judge Go found that while there is no dispute Mr. Chisholm waived his <u>Miranda</u> rights prior to his post-search interview with the detectives at 10:45 p.m., the statements that he seeks to suppress were made to Lt. Rafferty when he was re-arrested at 5:30 pm, before he received a second set of <u>Miranda</u> warnings.  (R&R 46, 1/3/08 Tr. 32.)  She also found that the illegality involved in searching the items in the closet did not amount to "flagrant misconduct," given the "complexities of the legal issues in determining whether authority to consent had been obtained."  (R&R 46.)  Nonetheless, she concluded that "given the proximity in time of the illegal search

that yielded the gun and ammunition to the post-search statements of the defendant and the lack of intervening circumstances . . . any of the defendant's post-search statements concerning the gun or ammunition are not purged of the taint of the unlawful search of the items in the closet." (R&R 46-47).

While the R&R's analysis makes no mention of the post-search statements concerning the drugs, the conclusion to the R&R recommends without elaboration that the court grant the Motion to Suppress "statements made after the search of the apartment." (Id. at 47.) The court reads the R&R's conclusion in light of its earlier analysis and construes the R&R as recommending the suppression only of the post-search statements concerning the gun, because the statement regarding the drugs did not result from being confronted with illegally obtained evidence.

I deny the parties' objections to Judge Go's recommendations regarding the post-search statements. The Government objects to the suppression of Mr. Chisholm's statements concerning the gun "for the same reasons it objects to the recommendation regarding the search itself." (Gov't Obj. 7.) It thus appears to concede that if the search of the closet itself were ruled illegal, then Mr. Chisholm's statements concerning the gun must be suppressed. The Government makes no attempt to establish that sufficient time elapsed or any intervening circumstances occurred so as to remove the taint of the unlawful search of the closet such that Mr. Chisholm's statements to Lt. Rafferty concerning the gun constituted an act of free will. See Kaupp v. Texas, 538 U.S. 626, 633 (2003) (noting that whether a confession following an illegal arrest was purged of the taint of illegality "is, of course, a function of circumstantial evidence, with the burden of persuasion on the State."). The Government's objections are denied. Defendant objects to the failure to recommend that the statements regarding the drugs be

suppressed (Def. Rep. Gov't Obj. 5 n.4, Docket Entry #29), but because I agree with Judge Go's finding that the drugs were obtained pursuant to a lawful search, this objection is denied.

I thus adopt this portion of the R&R, subject to the clarification that only Mr. Chisholm's post-search statements to Lt. Rafferty regarding the gun, not the drugs, are suppressed.

## III.    Conclusion

For the reasons stated above, after conducting a <u>de novo</u> review of those portions of the R&R to which the parties have objected, the R&R is adopted in its entirety, subject to the clarification that Defendant's post-search statements regarding the gun, not the drugs, are suppressed.  In sum, Defendant's Motion to Suppress is GRANTED with respect to physical evidence found in the closet and Defendant's post-search statements regarding the gun.  The Motion is DENIED with respect to Defendant's statements prior to the search of the apartment, physical evidence found in the dresser, and post-search statements regarding the drugs.

SO ORDERED.

_/s/ Nicholas G. Garaufis____
NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
        January 5, 2009